TROUTMAN PEPPER HAMILTON SANDERS LLP
Luke N. Eaton (SBN 280387)
  E-mail: luke.eaton@troutman.com
Two California Plaza
350 South Grand Avenue, Suite 3400
Los Angeles, CA 90071-3427
Telephone: 213.928.9800
Facsimile: 213.928.9850

Harris B. Winsberg (admitted *pro hac vice*)
  E-mail: harris.winsberg@troutman.com
Alexandra S. Peurach (admitted *pro hac vice*)
  E-mail: Alexandra.Peurach@troutman.com
Nathan T. DeLoatch (admitted *pro hac vice*)
  E-mail: nathan.deloatch@troutman.com
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
Telephone: 404.885.3000
Facsimile: 404.885.3900

Attorneys for Creditor
BAY POINT CAPITAL PARTNERS II, LP

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>JONATHAN L. SMITH,<br><br>          Debtor.<br>_____<br><br>BAY POINT CAPITAL PARTNERS II, LP,<br><br>          Plaintiff,<br><br>     v.<br><br>JONATHAN L. SMITH,<br><br>          Debtor-Defendant. | Case No. 2:21-bk-12542-BR<br><br>Chapter 7<br><br>Adversary No. _____<br><br>**COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(a)(2)(A)** |

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

**INTRODUCTION**

1.      Plaintiff and Creditor Bay Point Capital Partners II, LP ("**Bay Point**"), by and through counsel, files this complaint (the "**Complaint**") against Debtor-Defendant Jonathan L. Smith ("**Debtor**"), seeking a judgment that the obligations owed by Debtor to Bay Point are excepted from discharge and thus "non-dischargeable" pursuant to 11 U.S.C. § 523(a)(2)(A).

**THE PARTIES, JURISDICTION, AND VENUE**

2.      This adversary proceeding arises out of Debtor's Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Central District of California, *In re Jonathan L. Smith*, No. 2:21-bk-12542-BR.

3.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157.  Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

4.      Bay Point consents to entry of final orders or a judgment by this Court.

5.      Bay Point is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business in Atlanta, Georgia.  Bay Point is also a creditor with standing to request that the Court except from discharge the debt owed to Bay Point by the Debtor under 11 U.S.C. § 523(c)(1) and Federal Rule of Bankruptcy Procedure 4007.

6.      The Debtor is the Chapter 7 debtor in the above-captioned case and is a resident of Los Angeles, California.

**FACTUAL ALLEGATIONS**

7.      Pending in the United States District Court for the Northern District of Georgia is an action filed by Bay Point against the Debtor, as well as bankrupt defendants Hoplite, Inc. ("**Hoplite**") and Hoplite Entertainment, Inc. ("**Hoplite Entertainment**") (collectively, the "**Hoplite Entities**") controlled by the Debtor for, among other things, violations of the Racketeer

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA  90071-3427

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

1  Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, fraudulent misrepresentation,

2  and several breaches of contract.  *See Bay Point Capital Partners II, LP v. Hoplite, Inc., et al.*, No.

3  1:21-cv-00375-MLB (N.D. Ga.) (the "**District Court Action**").  As a result of their respective

4  bankruptcy filings, the District Court Action is currently stayed against the Debtor and the Hoplite

5  Entities.  The underlying misconduct forming the basis of that lawsuit constitutes the same basis

6  for the relief sought here.

7

8  ### *Initial Loan Discussions and Negotiations*

9       8.      In late August 2020, Bay Point was approached by a broker named Walter Josten

10  ("**Josten**"), who was aware that Bay Point was seeking investment opportunities in the media and

11  production industry.

12       9.      On August 24, 2020, two Bay Point employees, Chandler Rierson ("**Rierson**") and

13  Rob Moran ("**Moran**"), spoke with Josten by telephone.  Josten was joined in the conversation by

14  Max Musina ("**Musina**"), Josten's outside business partner.  During that conversation, Josten and

15  Musina informed Bay Point that they were aware of two California-based media companies seeking

16  short-term financing.  Specifically, Josten and Musina told Bay Point that the putative borrowers

17  were two related, closely-held entities—the Hoplite Entities—which were both under Debtor's

18  direct control and management.

19       10.     Josten further represented to Bay Point that the Hoplite Entities had significant

20  accounts receivable against which the Debtor was willing to borrow funds, and that the Debtor was

21  seeking funding to sustain his companies' operations until such receivables were realized.

22

23       11.     Specifically, Josten informed Bay Point that the Debtor was seeking immediate

24  funding in an amount between $1 million and $2 million, and that the Debtor was willing to borrow

25  against the Hoplite Entities' then-existing short-term accounts receivable of $3,438,000, which

26

27

28

1   consisted of a $1,488,000 receivable from "Screen media / Crackle / Sony," a $1,000,000 receivable

2   from "Fight Channel," and a $950,000 receivable from "Big Media / National Geographic."

3       12.     Bay Point requested documentation supporting the existence of, and amounts due

4   and owing under, the Hoplite Entities' claimed accounts receivable.  On August 27, 2020, the

5   Debtor, through Josten, provided Bay Point with what was represented to be documentary proof of

6   the Hoplite Entities' then-existing short-term accounts receivable.  Included among the documents

7   were: (1) a License Agreement between Hoplite Entertainment and Big Media Holdings LLC ("**Big

8   Media Holdings**") evidencing a purported receivable of $950,000; (2) a License Agreement

9   between Hoplite Entertainment and Screen Media Ventures, LLC ("**Screen Media Ventures**")

10  evidencing a purported receivable of $1,488,000; and (3) an Acquisition Agreement between

11  Hoplite and Ineomeida, Inc., d/b/a Fight Channel World Network ("**Fight Channel**") evidencing a

12  purported receivable of $1,000,000.

13      13.     Between August 27, 2020 and September 30, 2020 (the date of the execution of the

14  Loan Documents), Rierson and the Debtor had numerous telephone conversations regarding the

15  Loan.  During those conversations, the Debtor affirmed the validity of the third-party agreements

16  that Josten provided to Bay Point on the Debtor's behalf on August 27, 2020 and reiterated that the

17  receivable for each agreement would be due and payable to the Hoplite Entities prior to the Loan's

18  December 30, 2020 maturity date.

19      14.     On September 28, 2020, as part of Bay Point's pre-closing due diligence process,

20  Rierson sent an email to the Debtor asking the Debtor to "outline the expected payment period for

21  each agreement."  Later the same day, the Debtor responded, in writing, that Big Media Holdings

22  was "set to pay" its purported $950,000 indebtedness to Hoplite Entertainment "on Oct 15th," that

23  Fight Channel would pay its purported $1,000,000 indebtedness to Hoplite "by the 15th of

24  November," and that Screen Media Ventures was "set to pay" its purported $1,488,000

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA  90071-3427

indebtedness to Hoplite Entertainment "on the 30th of Oct."  A true and correct copy of the

September 28, 2020 email correspondence is attached hereto as **Exhibit A**.

### *Non-Disturbance, Standby, and Subordination Agreements*

15.     As part of Bay Point's due diligence process, Bay Point took steps to confirm the

Debtor's existing, outstanding indebtedness, as well as the Hoplite Entities' existing, outstanding

indebtedness.  To that end, Bay Point conducted searches to locate and identify all publicly-

available liens and other encumbrances filed against the Debtor and/or the Hoplite Entities.  During

this process, Bay Point identified numerous liens filed against each of the Debtor, Hoplite, and

Hoplite Entertainment by various creditors, as well as several UCC-1 "all-asset" liens asserted

against the Hoplite Entities.

16.     For example, Bay Point learned that Hoplite and Hoplite Entertainment are indebted

to Columbia State Bank under the terms of a Business Loan Agreement dated April 21, 2020 (the

"**SBA Loan**"), Hoplite and Hoplite Entertainment are jointly indebted to Porta Pellex LLC under

the terms of Loan Agreements dated April 17, 2019 and March 22, 2020 (the "**Porta Pellex**

**Loans**"), and Hoplite Entertainment is indebted to XXIII Capital Limited under the terms of a

Facility Agreement dated December 9, 2016 (the "**XXIII Capital Loan**").

17.     Accordingly, as a condition precedent to making the Loan, Bay Point required the

Debtor to obtain certain documents from the Hoplite Entities' then-existing creditors, including

debt subordination agreements, whereby the Hoplite Entities' secured creditors agreed to

subordinate their respective contractual repayment rights and security interests to Bay Point's Loan.

Bay Point also required the Debtor to obtain Columbia State Bank's express written consent prior

to executing the Loan.

18.     On September 28, 2020, the Debtor sent an email to Rierson.  Attached to the email

were, among other things, what the Debtor purported to be the SBA Loan documents, as well as

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA  90071-3427

signed standby creditor's agreements from five of the Hoplite Entities' creditors, including Columbia State Bank, Porta Pellex LLC, and XXIII Capital.  A true and correct copy of the September 28, 2020 email correspondence is attached hereto as **Exhibit B**.

19.     In the September 28, 2020 email, the Debtor provided Bay Point with what was purported to be Columbia State Bank's written consent to the execution of the Loan.  The Debtor also provided Bay Point a Standby Creditor's Agreement (the "**SBA Loan Standby Agreement**") in Bay Point's favor whereby Columbia State Bank agreed to subordinate its SBA Loan to Bay Point's Loan.  True and correct copies of the consent letter, SBA Loan Standby Agreement, and the SBA Loan documents provided by the Debtor to Bay Point are attached hereto as **Exhibit C**.

20.     Additionally, the Debtor attached to the September 28, 2020 email what he represented to be two Standby Creditor's Agreements in Bay Point's favor whereby Porta Pellex LLC and XXIII Capital agreed to subordinate the Porta Pellex Loans and the XXIII Capital Loan, respectively, to Bay Point's Loan (the "**Porta Pellex Standby Agreement**" and the "**XXIII Capital Standby Agreement**").  True and correct copies of the Porta Pellex Standby Agreement and the XXIII Capital Standby Agreement provided by the Debtor to Bay Point are attached hereto as **Exhibits D and E**, respectively.

21.     During its due diligence, Bay Point also required the Debtor to obtain signed non-disturbance agreements from Big Media Holdings, Fight Channel, and Screen Media Ventures, which directed the third-party account debtors to send any and all forthcoming payments from the Hoplite Entities' purported accounts receivable directly to Bay Point. Thus, on September 29, 2020, the Debtor provided Bay Point with what he represented to be signed non-disturbance agreements from Big Media Holdings, Fight Channel, and Screen Media Ventures.  A true and correct copy of the Debtor's September 29, 2020 email attaching the purported non-disturbance agreements is attached hereto as **Exhibit F**.

### *Execution of Loan Documents*

22.     After receiving the required documents from the Debtor and completing its due diligence process, Bay Point entered into the Loan and Security Agreement dated September 30, 2020 (the "**Loan Agreement**") with Hoplite and Hoplite Entertainment, jointly and severally. Pursuant to the Loan Agreement, Bay Point agreed to make a loan in the principal amount of $2 million with interest accruing each month.  The Loan Agreement bore a maturity date of December 30, 2020.  A true and correct copy of the Loan Agreement is attached hereto as **Exhibit G**.

23.     The Loan was evidenced by a promissory note, also in the amount of $2 million, dated September 30, 2020 (the "**Note**").  A true and correct copy of the Note is attached hereto as **Exhibit H**.

24.     The Debtor unconditionally guaranteed all payment and performance obligations owed by Hoplite and Hoplite Entertainment to Bay Point pursuant to the Loan Agreement and Note, as set forth in the Guaranty Agreement executed on September 30, 2020 (the "**Guaranty Agreement**").  As stated in the Guaranty Agreement, the Debtor was financially interested in the Hoplite Entities' affairs and expected to derive financial benefit from the Loan and other financial accommodations to be provided by Bay Point under or in connection with the Loan Agreement. Also as provided in the Guaranty Agreement, the Debtor's unconditional guaranty was a required term of the Loan Agreement.  A true and correct copy of the Guaranty Agreement is attached hereto as **Exhibit I**.

25.     The Loan Agreement, Note, and Guaranty Agreement are hereinafter referred to as, collectively, the "Loan Documents."

### *Relevant Provisions of the Loan Documents*

26.     Section 2.3(a) of the Loan Agreement provides that Hoplite and Hoplite Entertainment "shall pay [Bay Point] monthly installments of accrued and unpaid interest"

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

commencing on October 31, 2020.  Section 2.3(a) further provides that "[t]he outstanding principal balance of the Loan and all unpaid interest shall be paid in full on the Maturity Date."  As noted above, the Loan Agreement bore a maturity date of December 30, 2020.

27.    As a condition precedent to the Loan Agreement, the Debtor was required to execute and/or obtain certain "Loan Documents."  The term "Loan Documents" is defined to encompass, collectively, "this Agreement, the Note and any note or notes executed by Borrower, the Related Party Subordination Agreement, the Third Party Subordination Agreement, the Collateral Documents, each Compliance Certificate, and any other agreement entered into in connection with this Agreement."  (Ex. G at 5).

28.    Under Section 5.3, the Debtor represented that "[e]ach of this Agreement and each other Loan Document to which any Borrower is a party is the legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms."

29.    The Loan Agreement provides that the receivables evidenced by the License Agreement between Hoplite Entertainment and Big Media Holdings, the License Agreement between Hoplite Entertainment and Screen Media Ventures, and the Acquisition Agreement between Hoplite and Fight Channel would serve as "Specified Collateral" on the Loan.  (*Id*. at 7). The Loan Agreement also provides that, as a condition precedent, the Debtor was to provide Bay Point with duly executed "Non-Disturbance Agreements," (*id*. at § 2.11(b)), which were defined to include: (i) Non-Disturbance Agreement dated as of the Closing Date by and between the Lender and Big Media Holdings, (ii) Non-Disturbance Agreement dated as of the Closing Date by and between the Lender and Fight Channel, and (iii) Non-Disturbance Agreement dated as of the Closing Date by and between the Lender and Big Screen Media Ventures.  (*Id*. at 5).

30.    The Loan Agreement also states that Hoplite and Hoplite Entertainment agree to provide Bay Point with a lien and security interest in the form of a valid, first priority security

interest in certain of Hoplite and Hoplite Entertainment's presently existing and later acquired Collateral. (*Id*. at § 4.1).

31.     Section 5.8 of the Loan Agreement further provides that Hoplite and Hoplite Entertainment have "good title to, rights in, and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder and under the other Loan Documents, free and clear of any and all Liens except Permitted Liens," and that "the security interest granted herein and in the other Loan Documents constitutes a valid, first priority perfected security interest in the presently-existing Collateral, and will constitute a valid, first priority perfected security interest in Collateral acquired after the date hereof, subject, in each case, to Permitted Liens."

32.     To that end, the Loan Agreement also recognizes the existence of the Debtor's and the Hoplite Entities' other debt obligations and, as a condition precedent, required that they be subordinated to Bay Point's security interest. (*Id*. at § 3.1(a)).  Specifically, the Loan Agreement required execution of certain "Third Party Subordination Agreements," which are defined to include: (i) Standby Creditor's Agreement dated as of September 28, 2020 made by Turpera Group Ltd. for the benefit of the Lender, (ii) Standby Creditor's Agreement dated as of September 28, 2020 made by The Entrust Group Inc., FBO Gary Danklefsen, IRA 723xxxx for the benefit of the Lender, (iii) Standby Creditor's Agreement dated as of September 28, 2020 made by XXIII Capital Limited for the benefit of the Lender, and (iv) Standby Creditor's Agreement dated as of September 28, 2020 made by Porta Pellex, LLC for the benefit of the Lender. (*Id*. at 8).

33.     The Loan Agreement also acknowledges the "SBA Loan," which is defined to mean "that certain loan in the principal amount of $750,000.00 made by SBA Lender to Borrower," (*id*. at 7),  and required the Debtor to provide "evidence of the SBA Lender's consent to the Loan and the Liens granted pursuant to the Loan Documents, in form and substance satisfactory to Lender" as a condition precedent. (*Id*. at § 3.1(k)).

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

34.     Section 6.1(b) of the Loan Agreement also requires the Hoplite Entities to provide Bay Point with monthly financial statements that show the entities' "complete and correct . . . financial condition as at the end of each such month."

35.     Section 8 of the Loan Agreement defines the events that constitute an "Event of Default."  Under Section 8.1, any instance of the borrowers' failure to pay, when due, any principal, interest, or other amounts due and payable under the Loan Agreement constitutes an independent Event of Default.  Likewise, Section 8.2 provides that the failure to perform any obligation or the violation of any covenant in Section 6 and 7 of the Loan Agreement—including the duty to provide monthly financial statements under Section 6.1(b)—constitutes an independent Event of Default.

36.     Under the Guaranty Agreement, the Debtor "unconditionally and irrevocably guarantees to [Bay Point] the principal payment and performance of all of the obligations" owed by the Hoplite Entities to Bay Point pursuant to the Loan Agreement.  (Ex. I, § 1).

37.     The Debtor's Guaranty Agreement includes, without limitation, the unconditional and irrevocable obligation to pay "all loans, financial accommodations, and other sums now owing or which may in the future be owing by [the Hoplite Entities] under the Loan Agreement and the other Loan Documents, as and when the same are due and payable, whether on demand, at stated maturity, by acceleration or otherwise, and whether for principal, interest, fees, expenses, indemnification or otherwise."  (*Id.*).

38.     Pursuant to Sections 2 and 3 of the Guaranty Agreement, the Debtor's obligations are "absolute and unconditional" and "shall remain in full force and effect until payment in full of all Guaranteed Obligations and other amounts payable under this Guaranty and until the Loan Documents are no longer in effect."

39.     Section 10 of the Guaranty Agreement provides that in the event of an Event of Default under the Loan Agreement, Bay Point is permitted "in addition to exercising any remedies

set forth in this Guaranty or otherwise available at law or in equity, to accelerate Guarantor's obligations hereunder."

### Events of Default

40.     Pursuant to Section 2.3(a) of the Loan Agreement, the Hoplite Entities' first monthly installment payment of accrued and unpaid interest was due and payable on October 31, 2020.

41.     Neither the Hoplite Entities nor the Debtor paid the accrued and unpaid interest on October 31, 2020.  This constituted an "Event of Default" under Section 8.1 of the Loan Agreement.

42.     Pursuant to Section 2.3(a) of the Loan Agreement, the Hoplite Entities' second monthly installment payment of accrued and unpaid interest was due and payable on November 30, 2020.

43.     Neither the Hoplite Entities nor the Debtor paid the accrued and unpaid interest on November 30, 2020.  This constituted an additional "Event of Default" under Section 8.1 of the Loan Agreement.

44.     Additionally, despite numerous requests from Bay Point, neither the Debtor nor the Hoplite Entities provided Bay Point with the Hoplite Entities' monthly financial statements, thereby constituting an additional Event of Default under Section 8.2(a) of the Loan Agreement.

### Debtor Enters Forbearance Agreements & Acknowledges Debt

45.     As a result of the Events of Default, Bay Point was entitled to pursue any and all of the rights and remedies provided under Section 9 of the Loan Agreement, including the right to accelerate the entire outstanding indebtedness and the right to pursue any remedy available at law or equity against the Debtor and/or the Hoplite Entities.

46.     In or around early December 2020, the Debtor requested Bay Point forbear from exercising its undisputed rights and remedies under Section 9 of the Loan Agreement.  The parties ultimately reached a settlement that was to be memorialized in a written forbearance agreement.

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

47.     On December 4, 2020, Bay Point, on the one hand, and the Debtor and the Hoplite Entities, on the other, entered into a Forbearance Agreement (the "First Forbearance Agreement"). A true and correct copy of the First Forbearance Agreement is attached hereto as **Exhibit J**.

48.     At the time the parties entered into the First Forbearance Agreement, the Debtor's total outstanding indebtedness to Bay Point was $2,235,238.89, as evidenced by Recital H to the First Forbearance Agreement.  (*See* Ex. J, at 2).

49.     Under Section 9(a) of the First Forbearance Agreement, the Debtor "acknowledge[d] and confirm[ed]" that the Debtor was "liable to [Bay Point] under the Loan Documents for the full amount of the indebtedness thereunder as referenced in [Recital H]."

50.     Ultimately, the Debtor failed to make the payments set forth in Section 2 of the First Forbearance Agreement by the date provided therein, which constituted an "Event of Default" under the Agreement and extinguished Bay Point's forbearance obligations.

51.     On December 21, 2020, Bay Point, on the one hand, and the Debtor and the Hoplite Entities, on the other, entered into a subsequent Forbearance Agreement (the "Second Forbearance Agreement").  A true and correct copy of the Second Forbearance Agreement is attached hereto as **Exhibit K**.

52.     At the time the parties entered into the Second Forbearance Agreement, the Debtor's total outstanding indebtedness to Bay Point was $2,517,618.89, as provided in Recital I of the Second Forbearance Agreement.  (See Ex. K, at 2).

53.     Under Section 9(a) of the Second Forbearance Agreement, the Debtor "acknowledge[d] and confirm[ed]" that the Debtor is "liable to [Bay Point] under the Loan Documents for the full amount of the indebtedness thereunder as referenced in [Recital I]."

54.     Ultimately, the Debtor failed to make any of the payments set forth in Sections 3(a)–(b) of the Second Forbearance Agreement by the dates provided therein, which constituted

additional "Events of Default" under the Second Forbearance Agreement and again extinguished Bay Point's forbearance obligations.

55.     To date, neither the Hoplite Entities nor the Debtor have repaid any of their outstanding indebtedness to Bay Point, including the principal, interest, late fees, attorneys' fees, and other related costs and expenses.

### Debtor's Fraudulent Scheme Unravels

56.     The Debtor induced Bay Point into loaning his companies $2 million by, among other things: (1) representing to Bay Point that the Hoplite Entities had at least $3,438,000 in then-existing short-term accounts receivable from their prior agreements with three outside parties; (2) providing Bay Point with what were represented to be true and accurate copies of those agreements; (3) providing Bay Point with what were represented to be true and accurate copies of various stand-by creditor's agreements, debt subordination agreements, and a loan consent letter; (4) providing Bay Point with what were represented to be true and accurate copies of the underlying SBA Loan documents; and (5) providing Bay Point with what was represented to be a valid, first-priority security interest in the Collateral.

57.     After the Debtor and the Hoplite Entities defaulted on their payment obligations under the Loan Documents, the Debtor provided Bay Point with certain falsified electronic funds transfer notifications to delay Bay Point from foreclosing on the Loan.

### (1) Falsified ACH and Wire Transfer Confirmations

58.     In furtherance of his scheme to induce Bay Point to lend his companies $2 million, the Debtor agreed to assign the rights to payment of certain of his companies' outstanding accounts receivable to Bay Point as "Specified Collateral" on the Loan.  Thus, in accordance with Section 2.11 of the Loan Agreement and the respective non-disturbance agreements, any payments made to the Hoplite Entities under the third-party agreements specified above were to be made either (1)

directly to Bay Point by the third-party account debtors, or (2) to the Hoplite Entities, which were then obligated to remit the funds to Bay Point.

59.     Based on the Debtor's prior representations, Bay Point anticipated that Big Media Holdings would make its payment on October 15, 2020, that Screen Media Ventures would make its payment on October 30, 2020, and that Fight Channel would make its payment on November 15, 2020.  (*See* Ex. A).

60.     No payments were received on or before the dates the Debtor represented that such payment obligations would be fulfilled.  After confronting the Debtor with this information and threatening to foreclose on the Loan Documents, the Debtor indicated that the payments were imminent.

61.     On November 17, 2020, the Debtor sent an email to Rierson and Moran, who, as noted above, are the Bay Point employees primarily responsible for the relationship with the Debtor and the Debtor's companies.  A true and correct copy of the email correspondence is attached hereto as **Exhibit L**.

62.     In the November 17, 2020 email, the Debtor represented that he was forwarding an earlier email message from Seth Needle, a Screen Media Ventures executive, to the Debtor, which showed what appeared to be the confirmation of an outgoing Wells Fargo automated clearing house (ACH) transfer (a type of electronic funds transfer) from Screen Media Ventures.  The amount of the alleged ACH transfer was $1,488,000, which constituted the full amount purportedly owed to Hoplite Entertainment under its prior agreement with Screen Media Ventures, and to which Bay Point had purportedly been given a priority claim pursuant to Section 2.11 of the Loan Agreement and the relevant non-disturbance agreement.  Moreover, the account number shown as the recipient of the ACH transfer was a bank account belonging to Bay Point, making it appear as if Screen Media Ventures had initiated a payment of $1,488,000 directly to Bay Point.

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

63.     At the time the Debtor sent the November 17, 2020 email to Bay Point, the Debtor and the Hoplite Entities were already in default on the Loan Documents after failing to make the October 31, 2020 installment payment, and the date upon which the Debtor represented that Screen Media Ventures would make their payment under the License Agreement had passed.

64.     Thus, Bay Point was initially relieved to receive the Debtor's email, which made it appear as though $1,488,000 would be deposited into Bay Point's bank account within a matter of days.  In reliance on the Debtor's representations, Bay Point elected to delay foreclosure on the Loan.

65.     Bay Point never received the funds shown in the purported ACH transfer.

66.     Two weeks later, on December 1, 2020, Rierson forwarded the Debtor's November 17, 2020 email correspondence directly to Seth Needle at Screen Media Ventures and asked Mr. Needle to call him to discuss Screen Media Ventures' purported ACH transfer on November 17, 2020.

67.     Rierson contacted Mr. Needle so that Rierson could verify the terms of Screen Media Ventures' License Agreement with Hoplite Entertainment and confirm the status of the allegedly pending ACH transfer.  Rierson reached out to Mr. Needle directly because, prior to entering the Loan Agreement, the Debtor arranged a telephone conference between Rierson and an individual who represented himself to be Mr. Needle.

68.     Later that same day, Mr. Needle responded to Rierson via email, writing: "Unfortunately, it appears this is a scam, as I did not ever send any such email."

69.     The Debtor fabricated the Wells Fargo ACH transfer confirmation, including by making it appear as though Screen Media Ventures had electronically transferred to Bay Point's bank account the precise amount of its purported indebtedness under the License Agreement with Hoplite Entertainment.  The Debtor then sent a copy of the fraudulent ACH transfer notification to

Bay Point via email in order to convince Bay Point not to foreclose on the Loan Documents, which were then in default.

70.     In the interim, the Debtor forwarded another funds transfer confirmation to Rierson and Moran on November 20, 2020, which purported to show that the Debtor had initiated a wire transfer.  A true and correct copy of the November 20, 2020 email correspondence is attached hereto as **Exhibit M**.

71.     The wire transfer initiation notification indicated that the Debtor had purportedly initiated a $100,000 wire directly to Bay Point's bank account, and that the funds would be deposited on November 23, 2020.

72.     Again, however, Bay Point never received the funds reflected in the purported wire transfer notification.

73.     Upon information and belief, the Debtor also fabricated this second Wells Fargo wire transfer confirmation in an effort to further convince Bay Point not to exercise its remedies under the Loan Documents, which remained in default.  And, in reliance on the Debtor's representations, Bay Point elected to delay foreclosure on the Loan.

*(2) Falsified License Agreements*

74.     After Bay Point learned that the purported ACH funds transfer from Screen Media Ventures was fraudulent, Rierson asked Seth Needle to send Bay Point a copy of Screen Media Ventures' License Agreement with Hoplite Entertainment.

75.     On December 2, 2020, Mr. Needle responded to Rierson via email.  Attached to Mr. Needle's email correspondence was a copy of Screen Media Ventures' License Agreement with Hoplite Entertainment.  A true and correct copy of the License Agreement provided by Mr. Needle is attached hereto as **Exhibit N**.

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA  90071-3427

76.     The License Agreement provided by Screen Media Ventures via email on December 2, 2020 was nearly identical to the one previously provided to Bay Point by the Debtor during the initial Loan negotiations, with two glaring exceptions: There was no Section 2(c) requiring advance payments, and in Exhibit A of the License Agreement, there was no mention of the $1,488,000 monetary advance.  (*See* Ex. N).  These terms, however, appeared in the copy of the License Agreement that the Debtor provided to Bay Point during their Loan negotiations as proof of Hoplite Entertainment's then-existing receivable in the amount of $1,488,000.

77.     The Debtor fraudulently added material terms to the version of the License Agreement with Screen Media Ventures provided to Bay Point in order to make it appear as if Screen Media Ventures had agreed to advance Hoplite Entertainment the sum of $1,488,000, when Screen Media Ventures had not.  The Debtor also forged Screen Media Ventures' signatures in the version of the License Agreement that the Debtor provided to Bay Point.

78.     The Debtor then used that falsified License Agreement to induce Bay Point to lend the Debtor's companies the sum of $2 million and gave Bay Point "security" in the form of a priority right to a receivable that did not exist.

79.     The Debtor also falsified the non-disturbance agreement from Screen Media Ventures that the Debtor sent Bay Point on September 28, 2020, (*see* Ex. F), which attached a version of the falsified License Agreement and purported to be executed by Screen Media Ventures.

80.     Following receipt of Mr. Needle's December 1, 2020 email in which he informed Rierson that the purported ACH transfer appeared to be a "scam," Rierson spoke to Mr. Needle by phone.  Rierson did not recognize Mr. Needle's voice to be the same as the individual he had spoken to previously, in the telephone conference allegedly between Rierson and Mr. Needle that the Debtor arranged during the pre-loan diligence period.  Mr. Needle confirmed that he had never

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

1    previously spoken to Rierson, and that he did not participate in the earlier call that the Debtor

2    arranged.

3        81.    On March 1, 2021, a representative of Big Media Holdings confirmed that the

4    License Agreement between Big Media Holdings and Hoplite Entertainment that the Debtor

5    previously provided to Bay Point was also falsified.

6        82.    Specifically, the Big Media Holdings representative confirmed that Big Media

7    Holdings and Hoplite Entertainment were parties to a License Agreement, but that the license fee

8    under the true and correct License Agreement was $11,000, rather than the $950,000 evidenced by

9    the version of the License Agreement that the Debtor sent Bay Point on September 28, 2020, (*see*

10   Ex. F).  A true and correct copy of the un-doctored version of the Big Media Holding License

11   Agreement provided by Big Media Holdings to Bay Point is attached hereto as **Exhibit O**.

12       83.    The Debtor fraudulently modified material terms of the version of the License

13   Agreement with Big Media Holdings provided to Bay Point in order to make it appear as if Big

14   Media Holdings had agreed to pay a license fee of $950,000, when Big Media Holdings had not.

15       84.    The Debtor then used that falsified License Agreement to induce Bay Point to lend

16   the Debtor's companies the sum of $2 million and gave Bay Point "security" in the form of a

17   priority right to a receivable that was fraudulently overstated by $939,000.

18       85.    The Debtor also falsified the non-disturbance agreement from Big Media Holdings

19   that Debtor sent Bay Point on September 28, 2020, (*see* Ex. F), which attached a version of the

20   falsified License Agreement and purported to be executed by Big Media Holdings.  Bay Point relied

21   upon the falsified License Agreement and non-disturbance agreement when electing to enter the

22   Loan.

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA  90071-3427

### *(3) Falsified Standby, Subordination, and Consent Agreements*

86.     On February 9, 2021, counsel for Bay Point received an email from counsel for Columbia State Bank, Jane Pearson.  Columbia State Bank is the lender of record on the Debtor's SBA Loan.  A true and correct copy of the email correspondence from Ms. Pearson is attached hereto as **Exhibit P**.

87.     In the email, Ms. Pearson represented that the consent letter and Standby Creditor's Agreement that the Debtor provided to Bay Point during due diligence, which the Debtor represented to be from Columbia State Bank, were "falsely fabricated, do not contain signatures of representatives of Columbia Bank, are not part of loan documents between Columbia Bank and Hoplite, are not authorized by Columbia Bank, and are ineffective."

88.     Ms. Pearson further indicated that the loan documents that the Debtor provided to Bay Point and attached to the Standby Creditor's Agreement "are not true copies of the Business Loan Agreements between Columbia Bank and the Hoplite entities and were not signed by Lindsey Purdy on behalf of Columbia Bank."

89.     In light of the allegedly falsified Standby Creditor's Agreement, Ms. Pearson also stated that "Columbia Bank's perfected security interest in the Collateral (as defined in the Complaint) is senior to that of Bay Point Capital Partners II, L.P., as a review of the UCC-1 filings reveals."

90.     On February 17, 2021, Rierson emailed Kristofer Larson, legal counsel for Porta Pellex LLC, requesting a telephone call to discuss Porta Pellex's investment in Hoplite Entertainment.  Rierson and Mr. Larson spoke by phone that same day.  During the telephone call, Rierson asked Mr. Larson to confirm the validity of the Porta Pellex Standby Agreement that the Debtor had provided to Bay Point, and Mr. Larson asked Mr. Rierson to send him a copy of the purported Porta Pellex Standby Agreement to review.  Accordingly, Rierson sent Mr. Larson a

*TROUTMAN PEPPER HAMILTON SANDERS LLP*
*TWO CALIFORNIA PLAZA*
*350 SOUTH GRAND AVENUE*
*SUITE 3400*
*LOS ANGELES, CA  90071-3427*

copy of the Porta Pellex Standby Agreement that the Debtor previously provided to Bay Point and asked Mr. Larson to "[p]lease confirm via email the validity of this document." A true and correct copy of the email correspondence between Rierson and Mr. Larson is attached hereto as **Exhibit Q**.

91.     Later, on February 17, 2021, Mr. Larson responded to Rierson, stating: "Thanks for sending the standby agreement. I have never seen it; Noah Bronstein does not have authority to sign anything on behalf of Porta Pellex; and most importantly, Noah did not sign it. I believe someone signed it that was not Noah and did so without Noah's knowledge or consent."

92.     On March 25, 2021, counsel for Bay Point received an email from counsel for XXIII Capital.  XXIII Capital is a lender of record to Hoplite Entertainment and had purportedly executed the XXIII Capital Standby Agreement that the Debtor provided to Bay Point.  A true and correct copy of the email correspondence between counsel for XXIII Capital and counsel for Bay Point is attached hereto as **Exhibit R**.

93.     In the email, counsel for XXIII Capital referenced the District Court Action—which identified the XXIII Capital Standby Agreement—and requested a copy of any agreements that the Debtor provided to Bay Point that were purportedly executed by XXIII Capital, stating that "[o]ur client is trying to get a handle on the magnitude of the fraud perpetrated on it."

94.     After Bay Point provided XXIII Capital with a copy of the XXIII Capital Standby Agreement that the Debtor previously provided to Bay Point, XXIII Capital's counsel responded to counsel for Bay Point, writing: "In case you needed further confirmation, these documents are falsified. Even the purported 'Loan Agreement' bears no resemblance to the robust and extensive loan documents signed by the parties and dated December 9, 2016."

95.     As outlined above, the Debtor falsified the Columbia State Bank consent letter and the SBA Loan Standby Agreement, as well as the Porta Pellex Standby Agreement and the XXIII

Capital Standby Agreement, and forged the signatures of the respective signatories of the documents. The Debtor then provided these documents to Bay Point to induce Bay Point to enter into the Loan Agreement, despite the fact that the Debtor was obligated to provide "duly executed" copies of such documents as a condition precedent to the Loan Agreement. (*See* Ex. G, § 3.1(a)).

96.    Bay Point relied on these falsified documents to its detriment in deciding to proceed with making the Loan to the Debtor and the Hoplite Entities.

### *(4) Failure to Provide and Maintain Valid, First-Priority Security Interest*

97.    Under the Loan Agreement, the Debtor represented on behalf of the Hoplite Entities that "the security interest granted herein and in the other Loan Documents constitutes a valid, first priority perfected security interest in the presently-existing Collateral, and will constitute a valid, first priority perfected security interest in Collateral acquired after the date hereof, subject, in each case, to Permitted Liens." (Ex. G at § 5.8). The Debtor also agreed on behalf of the Hoplite Entities to "defend such security interest against the claims and demands of all Persons whomsoever." (*Id.* at § 6.7).

98.    By falsifying the Standby Creditor's Agreement from Columbia State Bank, a secured creditor with a perfected security interest in at least some of the same collateral later pledged to Bay Point, the Debtor failed to provide "a valid, first priority perfected security interest in the presently-existing Collateral."

99.    On December 8, 2020, an entity named Bondit LLC filed a UCC-1 Financing Statement with the California Secretary of State. The UCC-1 Financing Statement indicated that Hoplite Entertainment provided Bondit LLC with "a first priority security interest in, and all of the Debtors' right, title and interest in, to and under all property, tangible and intangible . . . as collateral security to secure the payment and performance in full of all the Obligations to the Secured Party."

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

A true and correct copy of Bondit LLC's UCC-1 Financing Statement is attached hereto as **Exhibit S**.

100.    Bay Point did not consent to subordinate its security interest in the Debtor's and/or Debtor's companies' Collateral to any subsequent lender, including Bondit LLC.

### *Bay Point Commences the District Court Action*

101.    On January 22, 2021, Bay Point initiated the District Court Action.  In its Verified Complaint, Bay Point alleged claims for, among other things, violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), several breaches of contract arising out of the Loan Documents, and fraudulent misrepresentation.

102.    Simultaneous with the filing of its Verified Complaint, Bay Point also filed an Emergency Motion for Appointment of Receiver and Request for Expedited Hearing (the "**Receivership Motion**").  (Dkt. 3; 3-1).  Through the Receivership Motion, Bay Point sought the appointment of a receiver to protect its interests with respect to the Collateral and to ensure that the Debtor and the Hoplite Entities did not engage in any further fraud to deprive Bay Point of its interest in the Collateral.

### *Initial Receivership Hearing & Preliminary Injunction*

103.    On February 10, 2021, the United States District Court held an evidentiary hearing on Bay Point's Receivership Motion.  After reviewing evidence, considering argument from both parties, and hearing live testimony from Rierson, the District Court made several oral findings of fact.  A true and correct copy of the relevant portions of the February 10, 2021 Transcript is attached hereto as **Exhibit T**.

104.    First, on the issue of whether Bay Point offered evidence of fraud sufficient to meet the legal standard applicable to a request for appointment of a receiver, the District Court found there to be "lots of evidence of fraud"  and "plenty of evidence that the defendant engaged in

fraudulent activity in order to receive the $2,000,000 loan." (Ex. T at 123:11, 138:5-7). The District Court then listed each act committed by the Debtor that the Court believed constituted evidence of fraudulent conduct.

105.     For example, the District Court found that the fact that Screen Media Ventures confirmed that the License Agreement provided by the Debtor to Bay Point was materially different than the true version of the License Agreement showed "clear evidence of fraud" by the Debtor and that the fraudulent License Agreement itself "provides a reason to believe that there was fraud here." (*Id.* at 123:17-21, 124:3-4).

106.     The District Court also found that the Debtor made "a misrepresentation, a fraudulent misrepresentation" to Bay Point regarding the imminence of the receivables from Big Media Holdings, Screen Media Ventures, and Fight Channel. (*Id.* at 123:22-124:2).

107.     Additionally, the District Court concluded that the falsified ACH and wire transfer notification emails "provide reason to believe that there was fraud here." (*Id.* at 124:5-6).

108.     The District Court also found evidence of fraudulent conduct arising out of Columbia State Bank's purported SBA Loan Standby Agreement, which was shown at the hearing to be a falsified document with a forged signature. (*Id.* at 124:7-14).

109.     The District Court also took note of the phone call that the Debtor coordinated between Rierson and an individual who was purported to be Seth Needle, a Screen Media Ventures executive, stating: "The ruse that he concocted to allow Mr. Rierson to believe that he was speaking to Mr. Needle at Screen Media to validate what was owed, and then Mr. Rierson learns later that he never spoke to Mr. Needle and for all evidence never spoke to anybody at Screen, because the things that he was told by the alleged Screen representative, that was supposed to be Mr. Needle, were not true. And maybe that happened with the other two [entities representing purported accounts receivable]. We don't know. What we do know is that [the Debtor] set up that phone call,

made the introduction, and did it for the purpose of misleading Mr. Rierson, and to the effect of misleading him." (*Id.* at 124:20-125:5)

110. Finally, the District Court concluded that the Debtor's refusal to provide access to the Hoplite Entities' bank statement gives "reason to believe there's fraudulent intent there." (*Id.* at 125:9-11).

111. Regarding the Debtor specifically, the District Court remarked to his attorney: "I suspect if your client was here, he might be taking the Fifth." (*Id.* at 125:18-19).

112. Ultimately, the District Court concluded that Bay Point had "shown me enough to get a receiver," including showing that the Debtor had committed fraud. Nevertheless, the District Court expressed concern that a remedy lesser than the appointment of a receiver may be sufficient to protect Bay Point's interest in the Collateral and thus elected to instead grant a preliminary injunction in Bay Point's favor that, among other things, provided Bay Point access to the Debtor's and the Debtor's companies' financial records and enjoined the Debtor and the Hoplite Entities from diminishing or wasting the Collateral. (*Id.* at 143:21-155:21).

113. On February 11, 2021, the Court issued a written order making certain findings of fact and setting forth the terms of the preliminary injunction (the "**Injunction Order**"). A true and correct copy of the Injunction Order is attached hereto and incorporated herein by reference as **Exhibit U**.

114. On the Debtor's fraudulent conduct, "[t]he Court concluded that Bay Point had shown fraudulent activity occurred, most notable by showing Defendants Hoplite entities and [the Debtor] fraudulently caused Bay Point to believe Hoplite was already legally entitled to payments totaling approximately $1,963,000 from the agreements with Screen Media Ventures, LLC ('Screen Media') and Big Media Holdings, LLC ('Big Media'), that the receipt of that money was imminent, and that Hoplite was on the cusp of delivering content to Ineomeida, Inc., d/b/a Fight

Channel World Network ('Fight Channel') and expected payment of approximately $1,000,000 from that company within forty-five days. The Court found Bay Point's witness (Chandler Rierson) credible and outlined additional evidence of Defendants' fraudulent activity beginning in at least late September 2020 and continuing into recent weeks." (Ex. U at 2-3). The District Court also reiterated that "Hoplite and [the Debtor] deceived Bay Point into believing Columbia State Bank had subordinated its SBA loan claim to Bay Point's loan." (*Id.* at 3 n.3).

### *Post-Injunction Proceedings & Bankruptcy Filings*

115.    On March 24, 2021, the Court held a renewed hearing on Bay Point's Receivership Motion. A true and correct copy of the relevant portions of the March 24, 2021 Transcript is attached hereto as **Exhibit V**. After determining that the Debtor's testimony was necessary to properly consider Bay Point's Receivership Motion, the Court adjourned the hearing and rescheduled it for March 31, 2021. The Court ordered the Debtor to appear in person at the March 31, 2021 hearing. (Ex. V at 52:23-56:6).

116.    On the evening of March 30, 2021, the Debtor and Hoplite Entertainment filed respective Petitions for Bankruptcy.

117.    The Court held the evidentiary hearing on March 31, 2021. The Debtor failed to comply with the Court's order to appear in person at the hearing. A true and correct copy of the relevant portions of the March 31, 2021 Transcript is attached hereto as **Exhibit W**.

118.    At the conclusion of the hearing, the Court orally granted Bay Point's Receivership Motion as to Hoplite only, recognizing that Bay Point's claims against the Debtor and Hoplite Entertainment were automatically stayed by their respective bankruptcy filings. (Ex. W at 6:4-7:3, 11:23-12:5).

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA  90071-3427

119.    On April 1, 2021, the Court entered its Order granting Bay Point's Receivership Motion (the "**Receivership Order**").  A true and correct copy of the Receivership Order is attached hereto and incorporated herein by reference as **Exhibit X**.

120.    After the Court entered the Receivership Order, Hoplite filed a Petition for Bankruptcy.

121.    As of the date of their respective bankruptcy filings, the Debtor and the Hoplite Entities owed Bay Point $2,970,277.78 plus legal fees, costs, expenses, and other amounts owing under the Loan Documents, applicable law and/or other amounts contained in the District Court Action (the "**Debt**").

### *Debtor Agrees to Plead Guilty to Wire Fraud*

122.    On June 8, 2021, the Acting United States Attorney for the Central District of California initiated a criminal proceeding against the Debtor by filing an Information in the United States District Court for the Central District of California charging the Debtor with one count of wire fraud in violation of 18 U.S.C. § 1343. *See United States of America v. Jonathan Lee Smith*, No. 2:21-cr-00272-JFW (C.D. Cal.) (the "**Criminal Proceeding**").  A true and correct copy of the Information filed in the Criminal Proceeding is attached hereto as **Exhibit Y**.

123.    The wire fraud charge arose solely out of the Debtor's above-described scheme to defraud Bay Point out of $2 million.  Specifically, the Information states that the Debtor engaged in a "scheme to defraud" Bay Point through which the Debtor "knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud [Bay Point] as to material matters, and to obtain money and property from [Bay Point] by means of material false and fraudulent pretenses, representations, promises, and the concealment of material facts," and that "[f]or the purpose of executing the above-described scheme to defraud, [the Debtor] transmitted and caused the transmission of an item by means of wire communication in interstate commerce,

1
2

namely, the transfer of approximately $1,951,416.80 from a bank account in Atlanta, Georgia, to the Hoplite Entertainment Account."  (Ex. Y at 2, 4).

3
4
5
6
7

124.    Concurrent with the initiation of the Criminal Proceeding, the parties jointly filed the Plea Agreement for Defendant Jonathan Lee Smith (the "**Plea Agreement**"), whereby the Debtor agreed to plead guilty to one count of wire fraud under 18 U.S.C. § 1343 as set forth in the Information.  A true and correct copy of the Plea Agreement is attached hereto as **<u>Exhibit Z</u>**.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

125.    The Plea Agreement states that the Debtor agrees to plead guilty to the commission of wire fraud in connection with the above-discussed scheme to defraud Bay Point.  Debtor admits that he "is, in fact, guilty of the offense to which [he] is agreeing to plead guilty." (Ex. Z at 8).  The Debtor also agrees not to contest the agreed-upon facts set forth in the Plea Agreement, including, *inter alia*, that the Debtor "knowingly made various misrepresentations and provided fabricated documents to [Bay Point], including several false license agreements with distributors that made it falsely appear that the Hoplite Entities had collective accounts receivable of $3,348,000 when, in fact, they did not . . . [and] provided [Bay Point] with several false standby agreements with secured creditors." (*Id*. at 8-9).  The Debtor further acknowledges that he "knowingly sent an email to representatives of [Bay Point] that contained fabricated correspondence from a representative of one of a distributor of Hoplite Entertainment's content and a false record of an automated clearing house (ACH) transfer of $1,488,000." (*Id*. at 9-10).  Finally, the Debtor acknowledges that "[a]s a result of [the Debtor's] scheme to defraud, he caused at least $2 million in losses to [Bay Point]." (*Id*. at 10).

24
25

126.    By agreeing to plead guilty to wire fraud, the Debtor also acknowledges that he "acted with the intent to defraud, that is, the intent to deceive and cheat." (*Id*. at 5).

26
27
28

127.    In entering the Plea Agreement, the Debtor agreed that he "understands that [the Debtor] will be required to pay full restitution to the victim of the offense to which [the Debtor] is

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA  90071-3427

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

pleading guilty," which is Bay Point. (*Id.* at 6). The Plea Agreement was effective upon signature and execution by the Debtor, his counsel, and an Assistant United States Attorney, which occurred on June 3, 2021. (*Id.* at 14, 18).

### *Bay Point's Claims Are Non-Dischargeable*

128.    By fraudulently inducing Bay Point to make a $2 million loan based upon numerous forged documents and false representations, the Debtor defrauded Bay Point.

129.    As the District Court specifically found at the Receivership Hearings, the Debtor falsified the license agreements that served as security on Bay Point's Loan, falsified numerous standby creditor's agreements and forged the signatures on such documents, and engaged in other unscrupulous conduct prior to and after execution of the Loan Documents that amounted to a clear course of fraudulent conduct.

130.    The Debtor's "scheme to defraud" Bay Point out of $2 million also serves as the sole basis for the Information charging the Debtor with one count of wire fraud.  By agreeing to plead guilty to the wire fraud charge, Debtor acknowledges that he "acted with the intent to defraud, that is, the intent to deceive and cheat," while engaging in the fraudulent conduct underlying the Debtor's Debt obligations to Bay Point.

131.    Accordingly, the Debt owed by the Debtor to Bay Point is non-dischargeable.

### **FIRST CLAIM FOR RELIEF**

### **Non-Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A)**

132.    Bay Point incorporates the allegations contained in paragraphs 1 to 131 of this Complaint by reference herein, as if restated verbatim.

133.    Section 523(a)(2)(A) of the Bankruptcy Code provides that "A discharge … does not discharge an individual debtor for any debt . . . for money, property, services, or an extension,

or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ."

134.    The Debtor made false statements and misrepresentations to Bay Point with the intent to induce Bay Point to make the Loan.  The Debtor's deception was essential to his overall plan to induce Bay Point to loan several million dollars to his companies.

135.    Specifically, and as evidenced by both the District Court's numerous oral and written findings in the District Court Action and the allegations set forth in the Information and Plea Agreement in the Criminal Proceeding, the Debtor engaged in several broad categories of fraud to induce Bay Point to loan his companies $2 million, including but not limited to: (i) falsifying license agreements from Screen Media Ventures and Big Media Holdings to make it appear as though the Debtor's companies had sizeable accounts receivable against which they could borrow; (ii) misrepresenting the existence and status of the aforementioned accounts receivable; (iii) falsifying the SBA Loan Standby Agreement, the Porta Pellex Standby Agreement, and the XXIII Capital Standby Agreement and forging the signatures of the respective signatories; and (iv) sending Bay Point falsified ACH and wire transfer confirmations.

136.    As a direct and proximate result of the Debtor's fraud and false representations, Bay Point was induced to loan $2 million to the Debtor's companies, which sum was personally and unequivocally guaranteed by the Debtor.    But for the Debtor's above-described false representations, false pretenses, and/or fraud, Bay Point would not have made the Loan.

137.    The foregoing establishes that the Debt owed to Bay Point by the Debtor should be non-dischargeable.

## **PRAYER**

**WHEREFORE**, Bay Point respectfully prays for judgment as follows:

1.    A determination that the Debt owed to Bay Point by the Debtor is a non-discharageable debt pursuant to 11 U.S.C. § 523(a)(2)(A);

2.    A judgment in favor of Bay Point and against the Debtor declaring that the Debt is non-dischargeable; and

3.    A judgment granting Bay Point such other and further relief as this Court deems just and proper.

Dated:        June 25, 2021                    TROUTMAN PEPPER HAMILTON
                                              SANDERS LLP


                                              By: */s/ Nathan T. DeLoatch*
                                              Luke N. Eaton (SBN 280387)
                                              Two California Plaza
                                              350 S. Grand Avenue, Suite 3400
                                              Los Angeles, CA 90071-3427
                                              Telephone: 213.928.9800
                                              Facsimile: 213.928.9850
                                              luke.eaton@troutman.com

                                              -and-

                                              Harris B. Winsberg (admitted *pro hac vice*)
                                              Alexandra S. Peurach (admitted *pro hac vice*)
                                              Nathan T. DeLoatch (admitted *pro hac vice*)
                                              600 Peachtree Street, NE, Suite 3000
                                              Atlanta, GA 30308
                                              Telephone: 404.885.3000
                                              Facsimile: 404.885.3900
                                              harris.winsberg@troutman.com
                                              alexandra.peurach@troutman.com
                                              nathan.deloatch@troutman.com

                                              *Attorneys for Creditor and Plaintiff Bay Point*
                                              *Capital Partners II, LP.*