# EXHIBIT G

## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement") is entered into as of September 30, 2020, by and among HOPLITE ENTERTAINMENT, INC., a California corporation ("Entertainment"), and HOPLITE, INC., a California corporation ("Hoplite"), jointly and severally, as borrowers (Entertainment and Hoplite are collectively the "Borrowers"), and BAY POINT CAPITAL PARTNERS II, LP, a Delaware limited partnership ("Lender"), as lender.

Lender has agreed to make to Borrowers, jointly and severally, a term loan upon the terms and subject to the conditions set forth herein. In consideration of the mutual agreements herein, the parties agree as follows:

1. **DEFINITIONS AND CONSTRUCTION.**

    **1.1** **Definitions**. As used in this Agreement, the following terms shall have the following definitions:

    "Account Debtor" means "account debtor" as such term is defined in the UCC.

    "Accounts" means all presently existing and hereafter arising accounts, contract rights, payment intangibles, and all other forms of obligations owing to any Borrower arising out of the sale or lease of goods or the rendering of services by such Borrower, whether or not earned by performance, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by such Borrower and such Borrower's books and records relating to any of the foregoing.

    "Administrative Account" has the meaning provided in Section 11.5(a) of this Agreement.

    "Affiliate" of any Person means (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person, (b) any partner, manager, trustee, officer or director of such Person and (c) with respect to Lender, any entity administered or managed by Lender or an Affiliate or investment advisor thereof and which is engaged in making, purchasing, holding or otherwise investing in commercial loans. A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to vote twenty percent (20%) or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managers or power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Unless expressly stated otherwise herein, Lender shall not be deemed an Affiliate of a Borrower.

    "Anti-Corruption Laws" shall mean all laws, rules and regulations of any jurisdiction applicable to Borrower and its Subsidiaries concerning or relating to bribery or corruption.

    "Bankruptcy Code" means Title 11 of the United States Code, §§ 101, *et seq*.

    "Business Day" means any day other than a Saturday, Sunday, or legal holiday in Atlanta, Georgia.

    "Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of

law) by any Governmental Authority; <u>provided</u>, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the direct or indirect sale, lease, transfer, conveyance or other disposition of any Equity Interest in any Borrower.

"Closing Date" means the date of this Agreement.

"Collateral" shall have the meaning set forth in Section 4.1 hereof.

"Collateral Documents" means, collectively, each Non-Disturbance Agreement, each guaranty agreement, and any other agreement or instrument pursuant to which any Borrower or any other Person grants or purports to grant collateral to Lender or otherwise relates to such Collateral.

"Compliance Certificate" means a certificate substantially in the form of Exhibit B.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise taxes or branch profits taxes.

"Copyrights" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof.

"Debtor Relief Laws" means the United States Bankruptcy Code, as amended, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any circumstance that, with the passage of time or giving of notice, would constitute an Event of Default.

"Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which Borrower has any interest.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" has the meaning assigned in Section 8.

"Excluded Taxes" means any of the following taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) taxes imposed on or measured by net income (however denominated), franchise taxes, and branch profits taxes, in each case, (i) imposed as a

result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding taxes imposed on amounts payable to or for the account of Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date hereof, and (c) any U.S. federal withholding taxes imposed under FATCA.

"Facility Termination Date" means the date all Obligations arising under the Loan Documents have been indefeasibly paid in full.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the IRC.

"FRB" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" means U.S. generally accepted accounting principles as in effect from time to time.

"Governmental Authority" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Guarantee" of or by any Person (a "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.  The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantor" means each Person who may from time to time provide a Guarantee of the Obligations in favor of Lender, including, as of the Closing Date, Jonathan Lee Smith, an individual residing in the State of California.

"Indebtedness" means, as to any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under capital leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred

purchase price of assets (other than (i) trade payables repayable in accordance with customary trade practices and (ii) obligations to pay for services provided by employees and independent contractors, in each case with respect to clauses (i) and (ii) incurred in the ordinary course of business which are not past due by more than 30 days), (f) net obligations of such Person under any hedging transactions, (g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment prior to the date that is 91 days after the Maturity Date in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (A) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (B) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning provided in Section 11.14.

"Indemnified Taxes" means (a) taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower or any other Obligor under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Insolvency Proceeding" means any proceeding commenced by or against any Person or entity under any provision of any Debtor Relief Law.

"Intellectual Property" means all of Borrower's right, title, and interest in and to the following: Copyrights, Trademarks and Patents; all trade secrets, all design rights, claims for damages by way of past, present and future infringement of any of the rights included above, all licenses or other rights to use any of the Copyrights, Patents or Trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights; all amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"Inventory" means all inventory in which Borrower has or acquires any interest, including work in process and finished products intended for sale or lease or to be furnished under a contract of service, of every kind and description now or at any time hereafter owned by or in the custody or possession, actual or constructive, of any Borrower, including such inventory as is temporarily out of its custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and such Borrower's books and records relating to any of the foregoing.

"Investment" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to, or other investment in, any Person.

"IRC" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

"Lender Party" has the meaning provided in Section 11.14.

"<u>Lien</u>" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance, including, without limitation, the security interest granted by each Borrower in <u>Section 4.1</u> hereof.

"<u>Loan</u>" means the term loan made by Lender to Borrowers, jointly and severally, on the Closing Date pursuant to <u>Section 2.1</u> in the original principal amount of Two Million and No/100 Dollars ($2,000,000.00).

"<u>Loan Documents</u>" means, collectively, this Agreement, the Note and any note or notes executed by Borrower, the Related Party Subordination Agreement, the Third Party Subordination Agreement, the Collateral Documents, each Compliance Certificate, and any other agreement entered into in connection with this Agreement, all as amended or modified from time to time.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business operations, assets, liabilities, properties, condition (financial or otherwise), or results of operations, of Borrowers, or (b) the ability of Borrowers to repay the Obligations or to perform its obligations under the Loan Documents or (c) the validity or enforceability of Lender's security interests in the Collateral.

"<u>Material Agreement</u>" means (i) each contract, agreement, instrument, permit, lease or license involving the payment of money in an aggregate amount of $50,000 or more, and (ii) each other contract, agreement, instrument, permit, lease or license, which the failure to comply with could reasonably be expected to result in a Material Adverse Effect.

"<u>Maturity Date</u>" means the earlier of (i) the Stated Maturity Date, and (ii) the date all or any of the Obligations are accelerated pursuant to <u>Section 9</u> of this Agreement.

"<u>Non-Disturbance Agreement</u>" means, with respect to the Specified Collateral, collectively, that certain (i) Non-Disturbance Agreement dated as of the Closing Date by and between the Lender and Big Media Holdings LLC, (ii) Non-Disturbance Agreement dated as of the Closing Date by and between the Lender and Ineomeida, Inc., d/b/a Fight Channel World Network, and (iii) Non-Disturbance Agreement dated as of the Closing Date by and between the Lender and Big Screen Media Ventures, LLC.

"<u>Note</u>" means a promissory note made by Borrowers in favor of Lender evidencing the Loan made by Lender, substantially in the form of <u>Exhibit A</u> attached hereto.

"<u>Obligations</u>" means (a) all advances to, and debts, liabilities, obligations, covenants and duties of, Borrowers arising under any Loan Document or otherwise with respect to the Loan, (b) all fees and expenses of Lender payable by Borrower hereunder or under any of the other Loan Documents, and (c) all other obligations of the Obligors arising hereunder or under any of the other Loan Documents, in each case identified in clauses (a) through (c) whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against Borrowers or any Affiliate thereof of any Insolvency Proceeding naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"<u>Obligor</u>" means each Borrower, each Guarantor, and any other Person who has granted a security interest or Lien in favor of Lender to secure all or any portion of the Obligations under the Loan Documents.

"<u>Other Connection Taxes</u>" means, with respect to Lender, taxes imposed as a result of a present or former connection between Lender and the jurisdiction (or political subdivision thereof) imposing such

110220598

tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such taxes that are Other Connection Taxes imposed with respect to an assignment.

"Participant" has the meaning provided in Section 11.3(d).

"Participant Register" has the meaning provided in Section 11.3(d).

"Patents" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"Patriot Act" has the meaning provided in Section 11.13.

"Permitted Indebtedness" means: (a) Indebtedness of Borrowers in favor of Lender arising under this Agreement or any other Loan Document; (b) Indebtedness consisting of the endorsement of negotiable instruments for deposit or collection of similar transaction in the ordinary course of business; (c) each Related Party Loan for so long as each Related Subordination Agreement is in effect; (d) each Third Party Loan for so long as each Third Party Subordination Agreement is in effect; (e) the SBA Loan provided, that the aggregate principal balance thereof does not exceed $1,700,000; and (f) other Indebtedness in an aggregate principal amount of up to Fifty Thousand Dollars ($50,000) at any time outstanding.

"Permitted Investments" means: (a) Investments in cash and cash equivalents; (b) Investments in an aggregate amount not in excess of Fifty Thousand Dollars ($50,000) at any time outstanding consisting of (i) travel advances and employee relocation loans and other employee loans and advances in the ordinary course of business and (ii) loans to employees, officers or directors relating to the purchase of equity securities of Borrower pursuant to employee stock purchase plan agreements approved by Borrower's board of directors (or the equivalent); and (c) other Investments in an aggregate principal amount of up to Fifty Thousand Dollars ($50,000) at any time outstanding.

"Permitted Liens" means the following: (a) Liens existing on the Closing Date and described on Schedule 7.4 or arising under this Agreement or the other Loan Documents; (b) Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, provided the same have no priority over any of Lender's security interests; (c) normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions and Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection; (d) Liens of carriers, warehousemen, mechanics, materialmen and repairmen or other like Liens arising in the ordinary course of business which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person; (g) deposits or Liens in the ordinary course of business under worker's compensation, unemployment insurance, social security and other similar laws, or to secure the performance of bids, trade contracts (other than for repayment of borrowed money), or to secure indemnity, performance or similar bonds for

6

the performance of bids, tender or contracts (other than for the repayment of borrowed money), or to secure contracts for the purchase of property, leases, statutory obligations, surety and appeals bonds, performance bonds and other obligations of a like nature, in each case, either incurred in the ordinary course of business or in connection with transactions permitted hereunder, and not representing Indebtedness for borrowed money; and (e) other Liens securing obligations in an aggregate principal amount of up to Fifty Thousand Dollars ($50,000) at any time outstanding.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"Related Party Loan" means, collectively, that certain (i) loan or loans from Hoplite Studios, a Georgia limited liability company, to one or both Borrowers in the aggregate principal amount of $4,055,972.64 and (ii) loan or loans from Guarantor to one or both Borrowers in the aggregate principal amount of $2,033,133.37.

"Related Party Subordination Agreement" means that certain (i) Subordination Agreement dated as of the Closing Date by and among Hoplite Studios, a Georgia limited liability company, Borrowers and the Lender, and (ii) Subordination Agreement dated as of the Closing Date by and among Guarantor, Borrowers and the Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Responsible Officer" means each of the President, the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer or other principal accounting and financial officer of Borrower (or any other officer or member having similar responsibilities).

"Sanctioned Country" shall mean, at any time, a country, region or territory that is, or whose government is, the subject or target of any Sanctions.

"Sanctioned Person" shall  mean, at any time, any Person that is (a) the subject or target of any Sanctions, (b)(x) located, organized, operating or resident in a Sanctioned Country, (y) an agency of the government of a Sanctioned Country, or (z) an organization controlled by a Sanctioned Country, or (c) owned or controlled by any such Person.

"Sanctions" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control or the U.S. Department of State, (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom or (c) any other relevant sanctions authority.

"SBA Lender" shall mean Columbia State Bank.

"SBA Loan" shall mean that certain loan in the principal amount of $750,000.00 made by SBA Lender to Borrower.

"Specified Collateral" shall mean all accounts receivable, rights to payment and other rights arising from (i) that certain License Agreement dated June 18, 2020, by and between Entertainment and Big Media Holdings LLC; (ii) that certain Acquisition Agreement dated March 4, 2020, by and between Ineomeida, Inc., d/b/a Fight Channel World Network and Hoplite; and (iii) that certain License Agreement dated July 1, 2020, by and between Entertainment and Big Screen Media Ventures, LLC.

110220598

"Specified Collateral Proceeds Account" has the meaning provided in Section 2.11(a) of this Agreement.

"Stated Maturity Date" means December 30, 2020.

"Subordinated Debt" means, collectively, (a) the Third Party Loan, (b) the Related Party Loan, and (c) any other Indebtedness that has been subordinated to any Borrower's Indebtedness to the Lender pursuant to a subordination agreement in form and substance satisfactory to the Lender.

"Subsidiary" means, with respect to any Person, a corporation, partnership, limited liability company or other entity of which such Person owns, directly or indirectly, such number of outstanding Equity Interests as have more than fifty percent (50%) of the ordinary voting power for the election of directors or managers (as applicable) of such corporation, partnership, limited liability company or other entity. Unless the context otherwise requires, each reference to Subsidiaries herein shall be a reference to Subsidiaries of Borrowers.

"Third Party Loan" means, collectively, that certain (i) loan from Turpera Group Ltd. to Borrowers pursuant to a Development & Co-Production Agreement dated as of April 15, 2018, (ii) loan from The Entrust Group Inc., FBO Gary Danklefsen, IRA 723xxxx to Hoplite pursuant to a Loan Agreement dated as of July 3, 2019, (iii) loan from XXIII Capital Limited to Entertainment pursuant to a Loan Agreement dated as of November 18, 2016, and (iv) loan from Porta Pellex, LLC to Hoplite pursuant to a Loan Agreement dated as of March 22, 2020.

"Third Party Subordination Agreement" means that certain (i) Standby Creditor's Agreement dated as of September 28, 2020 made by Turpera Group Ltd. for the benefit of the Lender, (ii) Standby Creditor's Agreement dated as of September 28, 2020 made by The Entrust Group Inc., FBO Gary Danklefsen, IRA 723xxxx for the benefit of the Lender, (iii) Standby Creditor's Agreement dated as of September 28, 2020 made by XXIII Capital Limited for the benefit of the Lender, and (iv) Standby Creditor's Agreement dated as of September 28, 2020 made by Porta Pellex, LLC for the benefit of the Lender.

"Trademarks" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of any Obligor connected with and symbolized by such trademarks.

"UCC" means the Uniform Commercial Code as in effect on the date hereof and from time to time in the State of Georgia, provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect on or after the date hereof in any other jurisdiction, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy.

**1.2    Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP; *provided* that if at any time any change in GAAP would affect the computation of any covenant (including any financial ratio) or requirement set forth in any Loan Document, and either Borrower or Lender shall so request, Borrower and Lender shall negotiate in good faith to amend such covenant (including any financial ratio) or requirement to preserve the original intent thereof in light of such change in GAAP; *provided, further*, that, until so amended, (a) such covenant (including any financial ratio) or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (b) Borrower shall provide Lender financial statements and other

documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  When used herein, the terms "financial statements" shall include the notes and schedules thereto.

### 1.3    Other Interpretive Provisions.

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    Section, Annex, Schedule and Exhibit references are to this Agreement unless otherwise specified.  The term "including" is not limiting and means "including without limitation."

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including."  Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

(d)    This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to Lender, Borrower and the other parties thereto and are the products of all parties.  Accordingly, they shall not be construed against Lender merely because of Lender's involvement in their preparation.

(e)    Terms used herein that are defined in the UCC, unless otherwise defined herein, shall have the meanings specified in the UCC.

## 2.    LOAN AND TERMS OF PAYMENT.

2.1    **Loan.**  Subject to and upon the terms and conditions of this Agreement, Lender agrees to make a single term loan to Borrowers, jointly and severally, on the Closing Date in a principal amount equal to Two Million and No/100 Dollars ($2,000,000.00).  The execution and delivery of this Agreement by Borrowers and the satisfaction of all conditions precedent pursuant to Section 3 shall be deemed to constitute Borrowers' request to borrow the Loan on the Closing Date.  Amounts repaid in respect of the Loan may not be reborrowed.  Borrowers shall use the proceeds of the Loan as provided in Section 6.10 of this Agreement.

2.2    **Promise to Pay.**  Borrowers promise to pay, jointly and severally, to the order of Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of the Loan.  Borrowers shall also pay interest on the unpaid principal amount of the Loan at rates in accordance with the terms hereof.  Lender may, at its option, charge any Obligations which are then due against any operating, investment or other account of any Borrower maintained with or under the control of Lender or any of its Affiliates, including, without limitation, the Administrative Account and the Specified Collateral Proceeds Account.

2.3    **Repayment and Prepayment of the Loan.**

110220598

(a)    **Repayment**. Commencing on October 31, 2020 and continuing on the last day of each month thereafter until the Maturity Date, Borrower shall pay Lender monthly installments of accrued and unpaid interest.  The outstanding principal balance of the Loan and all unpaid interest thereon shall be paid in full on the Maturity Date.

(b)    **Voluntary Prepayments**.  Except as provided in <u>Section 2.8(c)</u>, Borrower may prepay the Loan in whole or in part at any time, without premium or penalty.

(c)    **Mandatory Prepayments.**

(i)    **Proceeds of Issuances of Indebtedness or Equity.**  Immediately upon receipt by Borrower or any Subsidiary of any proceeds from any (A) issuance of Indebtedness (other than Indebtedness permitted by <u>Section 7.3</u>) by Borrower or any Subsidiary, or (B) issuance of any Equity Interests by Borrower or any Subsidiary after the Closing Date, Borrower shall prepay the then outstanding principal amount of the Loan and the other Obligations in an amount equal to all such proceeds (whether or not such proceeds are received by Borrower), net of reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by Borrower in connection therewith (in each case, paid to non-Affiliates).  Any such prepayment shall be applied in accordance with <u>Section 2.3(d)</u>.

(ii)    **Asset Dispositions and Extraordinary Receipts.**  Immediately upon receipt by Borrower or any Subsidiary of any proceeds of any sale or disposition by Borrower or any Subsidiary of any of its respective assets (other than asset sales or dispositions permitted under <u>Section 7.1</u>), or any proceeds from any casualty insurance policies or eminent domain, condemnation or similar proceedings, Borrower shall prepay the Obligations in an amount equal to all such proceeds (whether or not such proceeds are actually received by Borrower), net of commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by Borrower in connection therewith (in each case, paid to non-Affiliates).  Any such prepayment shall be applied in accordance with <u>Section 2.3(d)</u>.

(d)    **Application of Prepayments**.  Any prepayments made by Borrower pursuant to <u>Section 2.3(b)</u> or <u>(c)</u> shall be applied as follows: <u>first</u>, to Lender's fees and reimbursable expenses then due and payable pursuant to any of the Loan Documents; <u>second</u>, to interest then due and payable hereunder; and <u>third</u>, to the principal balance of the Loan, until the same shall have been paid in full.

## 2.4    <u>Interest Rates, Payments, and Calculations.</u>

(a)    **Interest Rates.**  Except as set forth in <u>Section 2.4(b)</u>, the outstanding principal amount of the Loan shall bear interest at a fixed rate of five percent (5%) per month, or the maximum rate permitted by law, whichever is less.

(b)    **Default Rate**.  Unless Lender otherwise consents in writing, all Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, at a rate equal to the sum of five percent (5.00%) per annum plus the otherwise applicable interest rate, or the maximum rate permitted by law, whichever is less.

(c)    **Interest Payments**.  Interest on the Loan shall be due and payable in arrears in accordance with <u>Section 2.3</u>.

(d)    **Computation**.  All interest chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

110220598

**2.5** **Crediting Payments**. Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 2:00 p.m. Atlanta time shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day. Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue and be payable for the period of such extension.

**2.6** **Withholding.** Payments received by Lender from Borrowers under this Agreement will be made free and clear of and without deduction for any taxes, except as required by any Governmental Authority, applicable law, regulation or international agreement. Specifically, however, if at any time any Governmental Authority, applicable law, regulation or international agreement requires Borrowers to make any withholding or deduction from any such payment or other sum payable hereunder to Lender, Borrowers hereby covenant and agree that, if such tax is an Indemnified Tax, the amount due from Borrowers with respect to such payment or other sum payable hereunder will be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lender receives a net sum equal to the sum which it would have received had no withholding or deduction been required, and shall pay the full amount withheld or deducted to the relevant Governmental Authority. Borrowers will, upon request, furnish Lender with proof reasonably satisfactory to Lender indicating that Borrowers have made such withholding payment; provided, however, that Borrowers need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings and as to which payment in full is bonded or reserved against by Borrowers. The agreements and obligations of Borrowers contained in this Section 2.6 shall survive the termination of this Agreement.

**2.7** **Additional Costs**. If any Change in Law shall: (a) subject Lender to any taxes (other than (i) Indemnified Taxes, (ii) taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (iii) Connection Income Taxes) on the Loan, loan principal, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; (b) impose, modify or deem applicable any reserve (including, without limitation, any imposed by the FRB), special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by Lender; or (c) impose on Lender or the foreign exchange and interbank markets any other condition affecting this Agreement; and the result of any of the foregoing is to increase the cost to Lender of making, continuing, or maintaining any part of the Obligations or to reduce the amount of any sum received or receivable by Lender under this Agreement by an amount deemed by Lender to be material, then Borrowers shall pay to Lender, within fifteen (15) days of any Borrower's receipt of a written notice (coupled with the certificate referenced in the next sentence) from Lender requesting such additional amount or amounts as will compensate Lender for such increased cost or reduction. A certificate of Lender, prepared in good faith and in reasonable detail by Lender and submitted by Lender to Borrower, setting forth the basis for determining such additional amount or amounts necessary to compensate Lender shall be conclusive and binding for all purposes, absent manifest error. In the event that any Change in Law affects or would affect the amount of capital required or expected to be maintained by Lender (or any corporation or entity controlling Lender), and Lender determines that the amount of such capital is increased by or based upon the existence of any obligations of Lender hereunder or the maintaining of any Obligations, and such increase has the effect of reducing the rate of return on Lender's (or such controlling corporation's or entity's) capital as a consequence of such obligations or the maintaining of such Obligations to a level below that which Lender (or such controlling corporation or entity) could have achieved but for such circumstances (taking into consideration its policies with respect to capital adequacy), then Borrowers shall pay to Lender, within fifteen (15) days of any Borrower's receipt of written notice (coupled with the certificate referenced in the next sentence) from Lender requesting such compensation, additional amounts as are sufficient to

compensate Lender (or such controlling corporation or entity) for any increase in the amount of capital and reduced rate of return which Lender reasonably determines to be allocable to the existence of any obligations of Lender hereunder or to maintaining any Obligations.  A certificate of Lender as to the amount of such compensation, prepared in good faith and in reasonable detail by Lender and submitted by Lender to any Borrower, shall be conclusive and binding for all purposes absent manifest error. Borrowers shall not be required to compensate Lender pursuant to this <u>Section 2.7</u> for any increased costs incurred or reductions suffered more than two hundred seventy (270) days prior to the date that Lender notifies any Borrower of the Change in Law giving rise to such increased costs or reductions, and of Lender's intention to claim compensation therefor (except that if the Change in Law giving rise to such increase costs or reductions is retroactive, then the two hundred seventy (270)-day period referred to above shall be extended to include the period of retroactive effect).

        **2.8**    <u>**Fees**</u>.  Borrower shall pay the following:

        (a)    **Origination Fee**.  On the Closing Date, an origination fee to Lender equal to Twenty Thousand and No/100 Dollars ($20,000.00), which origination fee shall be fully-earned on the Closing Date and shall be nonrefundable.

        (b)    **Prepayment Fee**. In the event that any prepayment of the Loan or the Maturity Date occurs for any reason prior to November 30, 2020 (including, without limitation, following acceleration by Lender upon the occurrence of an Event of Default), in view of the impracticality and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of Lender's lost profits as a result thereof, Borrowers agree to pay to Lender a prepayment fee in an amount equal to the interest that would have accrued on the principal amount of the Loan from the Closing Date through November 30, 2020 (the "<u>Prepayment Fee</u>").  For the avoidance of doubt, any Prepayment Fee owed by Borrowers to Lender in accordance with this <u>Section 2.8(b)</u> shall be in addition to any accrued and unpaid interest.

        (c)    **Late Payment Fee**.  If Lender has not received the full amount of any payment due hereunder (including, without limitation, the payment due on the Maturity Date), within five (5) days after the due date thereof, then Borrowers shall pay a late fee equal to ten percent (10%) of the amount of such late payment (including, without limitation, the outstanding principal balance of the Loan owed on the Maturity Date or following an acceleration of the Obligations by Lender); <u>provided</u>, that payments due on the Maturity Date shall not have a five (5) day grace period and any such payments are deemed late as of the date immediately after the Maturity Date.  Borrowers agree that such late charge is not a charge for the use of the money, but is imposed to compensate Lender for some administrative services, costs and losses associated with any default (including a payment default upon maturity) under the Note, and such late charge is fully earned and nonrefundable when accrued.  Collection or acceptance by Lender of such late charge shall not constitute a waiver of any remedies of Lender provided herein or otherwise at law.  After the Maturity Date, interest shall accrue on any unpaid principal amount of the Loan at the rate of twenty percent (20.00%) per annum or the maximum rate permitted by law, whichever is less.

        **2.9**    <u>**Term; Release of Collateral**</u>.

        (a)    <u>**Term**</u>. This Agreement shall become effective on the Closing Date and shall continue in full force and effect until the Facility Termination Date.

        (b)    <u>**Release of Collateral**</u>. Lender agrees to release (and to take any actions necessary to release) any Lien held by Lender against Collateral that is sold, transferred, conveyed or

110220598

otherwise disposed of by any Borrower in a transaction permitted by the Loan Documents and all Collateral upon the occurrence of the Facility Termination Date.

      **2.10**    **Loan Account.**  Lender will maintain one or more loan accounts for Borrowers to which Lender will charge all amounts advanced to or for the benefit of Borrowers hereunder or under any of the other Loan Documents and to which Lender will credit all amounts collected under the Loan from or on behalf of Borrowers.  The unpaid principal amount of the Loan, the unpaid interest accrued thereon, the interest rate or rates applicable to such unpaid principal amount and the accrued and unpaid fees, premiums and other amounts due hereunder shall at all times be ascertained from the records of Lender and such records shall constitute *prima facie* evidence of the amounts so due and payable, in the absence of manifest error.

### 2.11   Collection of Specified Collateral Receivables.

      (a)    All proceeds of the Specified Collateral shall be deposited in or remitted to the Specified Collateral Proceeds Account as set forth herein. On or prior to the Closing Date, the Lender shall designate a bank account (the "Specified Collateral Proceeds Account") owned by an escrow agent ( "Escrow Agent") acceptable to Lender into which cash, checks or other similar payments made pursuant to Section 2.11(b) shall be deposited, which Specified Collateral Proceeds Account is identified as such on Exhibit C. On or prior to the Closing Date, Lender, Borrower and Escrow Agent shall execute an escrow agreement (the "Escrow Agreement") in form and substance acceptable to Lender to confirm the terms and conditions applicable to the Specified Collateral Proceeds Account.

      (b)    Pursuant to the Non-Disturbance Agreements to be executed on or before the Closing Date, Borrowers shall direct all of the Account Debtors in respect of the Specified Collateral to forward payments directly to the Specified Collateral Proceeds Account.  Lender shall have sole access to and control of the Specified Collateral Proceeds Account at all times.  At no time shall any Borrower remove any item from the Specified Collateral Proceeds Account without the Lender's prior written consent.  If Borrowers should refuse or neglect to notify any Account Debtor to forward payments directly to the Specified Collateral Proceeds Account after notice from the Lender, the Lender shall be entitled to make such notification directly to such Account Debtor.  If notwithstanding the foregoing instructions, any Borrower receives any proceeds of the Specified Collateral, Borrowers shall receive and hold such payments in trust for the benefit of Lender, and shall immediately deposit all cash, checks or other similar payments related to or constituting payments made in respect of receivables  of the Specified Collateral received by it to the Specified Collateral Proceeds Account. The Lender shall hold and apply funds received into the Collection Account as provided by the terms of Section 2.12.

      (c)    The Specified Collateral Proceeds Account is solely for the protection of Lender. With respect to the Specified Collateral Proceeds Account, Lender shall have no responsibility beyond the allowance of due credit for the sums actually received by Lender or beyond the reimbursement or payment of the costs and expenses for which such Specified Collateral Proceeds Account were established in accordance with their terms. The requirements of this Agreement concerning the Specified Collateral Proceeds Account in no way supersede, limit or waive any other rights or obligations of the parties under any of the Loan Documents or under applicable law.

### 2.12   Disbursement and Application of Proceeds; Deficiency.

      (a)    Borrowers shall be permitted to obtain disbursements of funds (if any) on deposit in the Specified Collateral Proceeds Account in accordance with and subject to this Section 2.12 to make regularly scheduled payments of accrued and unpaid interest and/or prepayments of principal of the Loan (subject to Section 2.8(b)). For each such disbursement, the Borrower Representative shall deliver to

Lender a written request for such disbursement not less than five (5) business days prior to the date of such disbursement and. provided that all other conditions applicable to the requested disbursement set forth in this Agreement, as applicable, are satisfied, Lender shall disburse sums from the Specified Collateral Proceeds Account to Borrowers in accordance with its written instructions delivered to Lender. Notwithstanding the preceding sentence, in no event shall Lender be required to disburse funds from the Specified Collateral Proceeds Account if an Event of Default then exists and is continuing. Such disbursements shall not be made more frequently than once each calendar month. Notwithstanding the foregoing, the inadequacy of funds on deposit in the Specified Collateral Proceeds Account shall not relieve Borrower of its obligation to make any payments required by this Agreement with respect to the Loan and the Obligations. On and after the Facility Termination Date, any funds remaining on deposit in the Specified Collateral Proceeds Account shall be remitted to the Borrowers pursuant to written instructions provide by the Borrowers.

(b)      Borrowers shall remain liable for any deficiency if the proceeds of any sale or disposition of the Specified Collateral are insufficient to pay all of the Obligations, including any reasonable attorneys' fees and other expenses incurred by the Lender to collect such deficiency.

**2.13    <u>Borrower Representative</u>**.  Each of Borrowers irrevocably appoints Jonathan L. Smith, and Jonathan L. Smith shall act under this Agreement and the other Loan Documents, as Borrower representative, agent, attorney-in-fact and legal representative of such other Borrowers for all purposes, including, without limitation, for requesting Loans and receiving account statements and other notices and communications to Borrowers (or any of them) from Lender, (Jonathan L. Smith, in such capacity, the "<u>Borrower Representative</u>").   Lender may rely, and shall be fully protected in relying, on any notice, disbursement instruction, report, information or any other notice or communication made or given by Jonathan L. Smith, whether in its own name, as Borrower Representative, on behalf of any other Borrower or on behalf of the "Borrowers", and Lender shall not have any obligation to make any inquiry or request any confirmation from or on behalf of any other Borrower as to the binding effect on it of any such notice, request, instruction, report, information, other notice or communications, nor shall the joint and several character of Borrowers' obligations hereunder be affected, <u>provided, that</u> the provisions of this <u>Section 2.13</u> shall not be construed so as to preclude any Borrower from taking actions permitted to be taken by a "Borrower" hereunder.

**2.14    <u>Co-Borrowers</u>**.

(a)      Each Borrower agrees that it is jointly and severally liable to Lender for the payment or performance of all Obligations, and that such liability is independent of the obligations of the other Borrowers and shall be limited to an aggregate amount equal to the largest amount that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under any Debtor Relief Laws.  Lender may bring an action against any Borrower, whether or not an action is brought against the other Borrowers.

(b)      Each Borrower agrees that any release which may be given by Lender to any other Borrower will not release such Borrower from its obligations under this Agreement or any of the other Loan Documents.

(c)      Each Borrower waives any right to assert against Lender any defense, setoff, counterclaim or claim that such Borrower may have against any other Borrower or any other party liable to Lender for the obligations of Borrowers under this Agreement or any of the other Loan Documents.

(d)      Each Borrower agrees that it is solely responsible for keeping itself informed as to the financial condition of the other Borrowers and of all circumstances which bear upon the risk of

14

nonpayment.  Each Borrower waives any right it may have to require Lender to disclose to such Borrower any information that Lender may now or hereafter acquire concerning the financial condition of the other Borrowers.

(e)  Each Borrower waives all rights to notices of default or nonperformance by any other Borrower under this Agreement and the other Loan Documents.  Each Borrower further waives all rights to notices of the existence or the creation of new Indebtedness by any other Borrower.

(f)  Until all obligations of Borrowers under this Agreement and the other Loan Documents have been paid or otherwise performed in full, each Borrower waives any right of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under any Debtor Relief Laws, that such Borrower may now or hereafter have against any other Borrower with respect to the Obligations.  Each Borrower waives any right to enforce any remedy which Lender now has or may hereafter have against any other Borrower, and waives any benefit of, and any right to participate in, any security now or hereafter held by Lender.

(g)  Each Borrower hereby waives any election of remedies by Lender that impairs any subrogation or other right of such Borrower to proceed against any other Borrower or other person, including any loss of rights resulting from any applicable anti-deficiency laws relating to nonjudicial foreclosures of real property or other laws limiting, qualifying or discharging obligations or remedies.

3.  **CONDITIONS TO EFFECTIVENESS.**

3.1  **Conditions Precedent**.  The obligation of Lender to make the Loan is subject to the conditions precedent that Lender shall have received, in form and substance satisfactory to Lender, the following (all in form and substance acceptable to Lender):

(a)  duly executed counterparts of this Agreement, the Note, each guaranty agreement executed by a Guarantor, each Related Party Subordination Agreement, each Third Party Subordination Agreement, the Escrow Agreement, each of the other Loan Documents, and each of the other Collateral Documents;

(b)  such UCC financing statements, and other applicable documents under the laws of all necessary or appropriate jurisdictions with respect to the perfection of the Liens granted under this Agreement and the other Loan Documents, together with copies of UCC, tax, judgment, and fixture lien search reports and bankruptcy searches in all necessary or appropriate jurisdictions and under all legal names of Obligors, as requested by Lender, indicating that there are no Liens on any of the Collateral other than Permitted Liens or Liens which, in connection with the Loan, will be terminated or released, as applicable;

(c)  a certificate of the Secretary, Assistant Secretary or Responsible Officer of each Borrower, attaching and certifying copies of its certificate of formation or other registered organizational documents, limited liability company agreement, or the equivalent, as applicable, certificates of good standing or existence, as may be available from the Secretary of State of the jurisdiction of organization of Borrowers, and each other jurisdiction specified therein, and of the resolutions of its members, or comparable organizational documents and authorizations, authorizing the execution, delivery and performance of the Loan Documents and certifying the name, title and true signature of each officer of Borrowers executing the Loan Documents;

(d)  a duly executed funds disbursement memo;

110220598

(e)        copies of all consents, approvals, authorizations, registrations and filings and orders required or advisable to be made or obtained under any requirement of law, or by any contractual obligation of any Obligor, in connection with the execution, delivery, performance, validity and enforceability of the Loan Documents or any of the transactions contemplated thereby, and such consents, approvals, authorizations, registrations, filings and orders shall be in full force and effect;

(f)        all due diligence items, documentation and information from the Obligors reasonably requested by Lender, including financial information relating to the Collateral and all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act;

(g)        for each Guarantor executing a guaranty on the Closing Date who is a natural person, (i)(y) a credit report and (z) a criminal background check, in each case, dated as of a recent date, (ii) such Guarantor's personal financial statement, dated as of September 8, 2020, and (iii) a true, correct, and complete copy of the tax return filed by such Guarantor with the U.S. Internal Revenue Services for the tax year ended December 31, 2018;

(h)        certificates and endorsements of insurance naming Lender as loss payee or additional insured, as applicable, on Borrower and each Obligor's casualty and liability policies as may be requested by Lender;

(i)        payment of all fees and expenses of Lender due and payable on the Closing Date;

(j)        Intentionally Omitted;

(k)        evidence of the SBA Lender's consent to the Loan and the Liens granted pursuant to the Loan Documents, in form and substance satisfactory to Lender;

(l)        a broker opinion and/or an appraisal, in either case, with respect to the valuation of the Specified Collateral;

(m)        all representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects as of the date hereof;

(n)        no Default or Event of Default shall exist as of the date hereof;

(o)        no event or circumstance shall exist or have occurred as of the date hereof which has had, or which could reasonably be expected to have, a Material Adverse Effect;

(p)        there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that, in the judgment of Lender, prohibits, restricts or imposes a materially adverse condition upon the Borrower or any Guarantor, this Agreement, the Loan Documents, or the exercise by Lender of its rights as a secured party with respect to the Collateral; and

(q)        such other documents, and completion of such other matters, as Lender may reasonably request.

**3.2        Post-Closing Conditions**.  No later than the dates set forth below, Borrowers shall deliver to Lender (all in form and substance acceptable to Lender):

(a)      The date that is thirty (30) days after the Closing Date, evidence in form satisfactory to Lender that Hoplite has satisfied (i) that certain lien in favor of the State of California Employment Development Agency, Filing Number U200003109317, filed on July 21, 2020, and (ii) that certain lien in favor of the State of California Employment Development Agency, Filing Number U2000016410118, filed on September 4, 2020; and

(b)      The date that is five (5) days after the Closing Date, a favorable written opinion of counsel to the Obligors, addressed to Lender, and covering such matters relating to the Obligors, the Loan Documents and the transactions contemplated therein as Lender shall reasonably request.

4.      **SECURITY.**

4.1      <u>**Security Interest in the Collateral**</u>. To secure prompt payment of any and all Obligations and prompt performance by each Borrower of each of its covenants and duties under the Loan Documents, each Borrower hereby grants Lender a continuing Lien on and security interest in all of such Borrower's right, title and interest in and to all of the following presently existing and hereafter acquired or arising property, wherever located (collectively, the "<u>Collateral</u>"): all Accounts; chattel paper (including tangible and electronic chattel paper); commercial tort claims; deposit accounts; securities accounts; documents (including negotiable documents); equipment (including all accessions and additions thereto); general intangibles (including payment intangibles and software), including, without limitation, the Specified Collateral; Intellectual Property; goods (including fixtures); instruments (including promissory notes); inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions); investment property (including securities and securities entitlements); letter of credit rights; money; all books and records with respect to any of the foregoing and the computers and equipment containing any such books and records; any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. Such security interest constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in Collateral acquired after the date hereof, subject, in each case, to Permitted Liens. Each Borrower hereby authorizes Lender to file financing statements, without notice to such Borrower, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by such Borrower or any other Person, shall be deemed to violate the rights of Lender under the UCC. Such financing statements may indicate the Collateral as "all assets of the Borrower" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Lender's discretion.

4.2      <u>**Borrower's Accounts, Pledge and Assignment**</u>.  As additional security for Borrower's performance under the Loan Documents, each Borrower hereby irrevocably pledges and assigns to Lender all monies at any time deposited in the Administrative Account and the Specified Collateral Proceeds Account.

4.3      <u>**Inspection Rights.**</u>  Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during any Borrower's usual business hours, to inspect such Borrower's books and records, and, at any time and from time to time in Lender's sole discretion, to make copies thereof and to conduct examinations and inspections of the Collateral or check, test, and appraise the Collateral in order to verify such Borrower's financial condition or the amount, condition of, or any other matter relating to, the Collateral, all at such Borrower's expense.

**5.      REPRESENTATIONS AND WARRANTIES.**

Each Borrower represents and warrants as follows:

**5.1      Due Organization and Qualification**.  Each Borrower is a corporation duly existing under the laws of the State of California and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified except where a failure to be so qualified or licensed could not reasonably be expected to have a Material Adverse Effect.

**5.2      Due Authorization; No Conflict**.  The execution, delivery, and performance of the Loan Documents by Borrowers and the borrowings and other obligations incurred by Borrowers hereunder and under the other Loan Documents are within such Borrower's powers, have been duly authorized, and do not and will not (a) conflict with or constitute a breach of any provision contained in Borrower's certificate of formation or operating agreement or other applicable organizational or governing documents, (b) require any consent or approval of any governmental agency or authority (other than any consent or approval which has been obtained and is in full force and effect), (b) conflict in any material respect with any provision of applicable law or any judgment, order or decree, which is binding upon any Borrower or any of its respective properties, (c) conflict with or constitute an event of default under any Material Agreement to which any Borrower is a party or by which any Borrower is bound, or (d) require, or result in, the creation or imposition of any Lien on any asset of any Borrower (other than Liens in favor of Lender created pursuant to the Loan Documents).  No Borrower is in default under any Material Agreement to which it is a party or by which it is bound.

**5.3      Validity and Binding Nature**.  Each of this Agreement and each other Loan Document to which any Borrower is a party is the legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

**5.4      Financial Condition.**

(a)      The financial statements of each Obligor delivered to Lender prior to the Closing Date or pursuant to the terms hereof were prepared in accordance with GAAP (subject, in the case of interim financial statements, to normal year-end adjustments and the absence of footnotes) and present fairly in all material respects the financial condition of such Obligor and its Subsidiaries (as applicable) as at such dates and the results of its operations for the periods then ended and disclose all Indebtedness and other liabilities (direct or contingent) of such Obligor and its Subsidiaries (as applicable) as of the date thereof.

(b)      Immediately prior to and after giving effect to the Loan hereunder and the use of the proceeds thereof, (i) the fair value of the assets of each Borrower is and will be greater than the amount of its liabilities, as such value is established and liabilities evaluated in accordance with applicable Debtor Relief Laws, (ii) the present fair saleable value of Borrower's assets is and will be not less than the amount that will be required to pay the probable liability on its debts as they become absolute and matured, (iii) each Borrower is and will be able to realize upon its assets and pay its debts and other liabilities as they mature in the normal course of business, (iv) no Borrower intends to, and does not believe that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature in the normal course of business, and (v) no Borrower is and does not intend to be engaged in business or a transaction, for which its property would constitute unreasonably small capital.

5.5    **No Material Adverse Effect.** No Material Adverse Effect has occurred and is continuing.

5.6    **No Litigation.** Except as set forth on Schedule 5.6, no litigation (including derivative actions), arbitration proceeding or governmental investigation or proceeding is pending or, to each Borrower's knowledge, threatened in writing against any Obligor which could reasonably be expected to have a Material Adverse Effect.

5.7    **Ownership of Properties; Liens.** Each Borrower owns good and marketable title to all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever, free and clear of all Liens, charges and claims except for Permitted Liens or other liens disclosed to Lender in writing.

5.8    **Collateral.** (i) Each Borrower has good title to, rights in, and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder and under the other Loan Documents, free and clear of any and all Liens except Permitted Liens; (ii) the security interest granted herein and in the other Loan Documents constitutes a valid, first priority perfected security interest in the presently-existing Collateral, and will constitute a valid, first priority perfected security interest in Collateral acquired after the date hereof, subject, in each case, to Permitted Liens; and (iii) no financing statement or other public notice authorized by any Borrower with respect to all or any part of the Collateral is on file or of record in any public office, except filings evidencing Liens permitted by the Loan Documents. Each Borrower's exact legal name and jurisdiction of organization are as set forth in the opening paragraph of this Agreement. Except as set forth in Schedule 5.8, no Borrower has used any other legal name or changed its legal name or jurisdiction of organization in the five (5) years prior to the Closing Date.

5.9    **Compliance with Laws.** Each Borrower and each Subsidiary is in compliance in all material respects with the requirements of all laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.10    **Governmental and Regulatory Matters.** Each Borrower and each Subsidiary have obtained all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary for the continued operation of such Borrower's or Subsidiary's business as currently conducted. Each Borrower and each Subsidiary have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from any Borrower's failure to comply with ERISA that could result in such Borrower incurring any material liability. No Borrower is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940. No Borrower is engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the FRB).

5.11    **Environmental Condition.** None of any Borrower's or any Subsidiary's properties or assets, has ever been used by any Borrower or any Subsidiary or, to each Borrower's knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with applicable law. To each Borrower's knowledge, none of any Borrower's properties or assets, have ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or

110220598

hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute; no lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned by any Borrower or any Subsidiary.  Neither any Borrower nor any Subsidiary have received a summons, citation, notice, or directive from the Environmental Protection Agency or any other Governmental Authority concerning any action or omission by any Borrower or any Subsidiary resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

5.12    **Taxes**.  Each Borrower has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such return, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books.  Each Borrower has made adequate reserves on its books and records in accordance with GAAP for all taxes that have accrued but which are not yet due and payable.

5.13    **Equity Ownership; Subsidiaries**.  All issued and outstanding Equity Interests of each Borrower and each Subsidiary are duly authorized and validly issued and all capital stock is fully paid and non-assessable, and free and clear of all Liens other than Permitted Liens, and such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities.  All of the authorized, issued and outstanding Equity Interests of Borrower and any Subsidiary are owned as set forth on <u>Schedule 5.13</u> on the Closing Date.  On the Closing Date, except as set forth on <u>Schedule 5.13</u>, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights or other similar agreements or understandings for the purchase or acquisition of any Equity Interests of any Borrower or any Subsidiary.

5.14    **Insurance**.  Each Borrower and its properties are insured with financially sound and reputable insurance companies which are not Affiliates of such Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where Borrower operates.

### 5.15    **Sanctions and Anti-Corruption Laws**.

(a)    None of any Obligor nor any of their respective Subsidiaries or directors, officers, employees, agents or affiliates of such Obligor or Subsidiary is a Sanctioned Person.

(b)    Each Obligor, each of their respective Subsidiaries and their respective directors, officers and employees and, to the knowledge of each Borrower, the agents of each Obligor and each of their respective Subsidiaries, are in compliance with applicable Anti-Corruption Laws and applicable Sanctions.  Each Obligor and each of their respective Subsidiaries have instituted and maintain policies and procedures designed to ensure continued compliance with applicable Anti-Corruption Laws and applicable Sanctions.

5.16    **No Default**.  No Default or Event of Default exists or would result from the incurrence by Borrower of any Obligations hereunder or under any other Loan Document.

5.17    **Full Disclosure**.  No representation, warranty or other statement of any Obligor in any certificate or statement given to Lender, as of the date such representation, warranty, or other statement was made, taken together with all such certificates and statements given to Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not materially misleading (it being recognized by Lender that the projections and forecasts provided by Obligors are based on good faith estimates and assumptions

110220598

believed by Borrowers to be reasonable as of the date of the applicable projections or assumptions, are not viewed as facts, and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results).

**6.     AFFIRMATIVE COVENANTS.**

Until the Facility Termination Date:

**6.1     Financial Statements, Reports, Certificates, and Notices**.  Borrower shall provide Lender with the following (each of which shall be in form and substance satisfactory to Lender):

(a)     **Intentionally Omitted.**

(b)     **Monthly Financial Statements.**  As soon as available and in any event within fifteen (15) days after the end of each calendar month, consolidated and consolidating balance sheets of each Borrower and their Subsidiaries as at the end of such month and the related consolidated and consolidating statements of income and retained earnings and cash flows, of each Borrower and their Subsidiaries for such month, and the portion of the fiscal year ended at the end of such month, all in reasonable detail, reviewed by each Borrower's independent certified public accountant, which accountant shall be reasonably acceptable to Lender and certified by the principal accounting and financial officer (or other officer acceptable to Lender in its sole discretion) of Borrowers that they are complete and correct and that they present fairly in all material respects the financial condition as at the end of such month, and the results of operations for such month and such portion of the fiscal year of Borrowers and their Subsidiaries in accordance with GAAP consistently applied (subject to normal year-end adjustments and the absence of footnotes).

(c)     **Compliance Certificates.**  Together with the financial statements required to be delivered pursuant to Section 6.1(a) and Section 6.1(b) (and beginning with the calendar month ending October 31, 2020), a Compliance Certificate executed by the principal financial and accounting officer of the Borrower Representative (or other officer acceptable to Lender in its sole discretion) to the effect that, based upon a review of the activities of the Borrowers and their Subsidiaries and such financial statements during the period covered thereby, no Default or Event of Default exists, or if a Default or an Event of Default exists, specifying the nature thereof and the Borrowers' or applicable Subsidiary's proposed response thereto.

(d)     **Notice of Default.**  Promptly (and in any event within three (3) Business Days) after the occurrence of a Default or an Event of Default, notice thereof and a statement of a Responsible Officer of the Borrower Representative specifying the nature thereof and Borrower's proposed response thereto.

(e)     **Specified Collateral**.     Promptly (and in any event within three (3) Business Days) after the occurrence of a default, an event of default, receipt of a termination notice under, or termination of, any agreement included in the Specified Collateral, notice thereof and a statement of a Responsible Officer of the Borrower Representative specifying the nature thereof and Borrower's proposed response thereto.

(f)     **Litigation.**  Promptly after the occurrence thereof, and in any event within three (3) Business Days after any Borrower knows or has reason to know of the occurrence thereof, notice of the institution of or any adverse development in any action, suit or proceeding or any governmental investigation or any arbitration, before any court or arbitrator or any Governmental Authority against any Borrower or any material property of any Borrower.

110220598

(g) **Material Adverse Effect.** Prompt notice of any other event, condition, development or occurrence that has or results in, or could reasonably be expected to have or result in, a Material Adverse Effect.

(h) **Formation of Subsidiaries.** Promptly upon forming any Subsidiary, notice thereof, together with the capitalization and ownership of such Subsidiary and copies of such Subsidiary's organizational documents.

(i) **Intentionally Omitted**.

(j) **Intentionally Omitted**.

(k) **Other Information.** Promptly, such additional financial and other information, including, but not limited to, financial statements of each Borrower and information regarding any Guarantor or the Collateral as Lender may from time to time reasonably request.

**6.2** **Good Standing**. Each Borrower shall maintain its and any Subsidiary's corporate or other entity existence and good standing in its jurisdiction of incorporation or formation and maintain qualification in each jurisdiction in which it is required under applicable law except where a failure to do so would not reasonably be expected to have a Material Adverse Effect. Each Borrower shall maintain, and shall cause any Subsidiary to maintain, in force all licenses, approvals and agreements, the loss of which could reasonably be expected to have a Material Adverse Effect.

**6.3** **Compliance**. Each Borrower shall comply, and cause any Subsidiary to comply, in all material respects with all applicable laws, rules, regulations, decrees, orders, judgments, licenses and permits, except where failure to comply could not reasonably be expected to have a Material Adverse Effect. Each Borrower shall meet, and shall cause any Subsidiary to meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, except where a failure to meet such minimum funding requirements could not reasonably be expected to have a Material Adverse Effect. Without limiting the forgoing, each Borrower shall ensure, and cause any Subsidiary to ensure, that no person who owns a controlling interest in or otherwise controls any Borrower is or shall be a Sanctioned Person. Each Borrower shall comply, and cause any Subsidiary to comply, with all applicable Anti-Corruption Laws, Bank Secrecy Act and anti-money laundering laws and regulations. Each Borrower will maintain in effect and enforce policies and procedures designed to promote and achieve compliance by Borrowers, any Subsidiary and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

**6.4** **Taxes**. Each Borrower shall make, and shall cause any Subsidiary to make, due and timely payment or deposit of all federal and material state, local and other taxes, assessments, or contributions required of it by law, and will execute and deliver to Lender, on demand, appropriate certificates attesting to the payment or deposit thereof; and each Borrower will make, and will cause any Subsidiary to make, timely payment or deposit of all tax payments and withholding taxes required of it by applicable laws and will, upon request, furnish Lender with proof satisfactory to Lender indicating that such Borrower or applicable Subsidiary has made such payments or deposits; _provided_ that Borrowers and their Subsidiaries need not make any payment if the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by Borrowers.

**6.5**     **Insurance.**

(a)     Each Borrower, at its expense, shall keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks, and in such amounts, as ordinarily insured against by other owners in similar businesses conducted in the locations where each Borrower's business is conducted on the date hereof.  Each Borrower shall also maintain insurance relating to such Borrower's business, ownership and use of the Collateral in amounts and of a type that are customary to businesses similar to such Borrower's business.

(b)     All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender.  All such policies of property and liability insurance shall contain a lender's loss payable and additional insured endorsement (as applicable), in a form satisfactory to Lender, showing, upon Lender's request, Lender as an additional insured and loss payee thereof, and all liability insurance policies shall show Lender as an additional insured and shall specify that the insurer must give at least thirty (30) days' prior notice to Lender before canceling its policy for any reason.  Upon Lender's request, each Borrower shall deliver to Lender certified copies of such policies of insurance and evidence of the payments of all premiums therefor.  After the occurrence and during the continuance of an Event of Default, all proceeds payable under any such policy shall, at the option of Lender, be payable to Lender to be applied on account of the Obligations.  If no Event of Default exists, subject to Section 2.3(c)(ii), proceeds with respect to Collateral payable under any policy may be used by any Borrower to repair or replace damaged or destroyed Collateral or otherwise acquire property useful in its business.

**6.6**     **[Reserved.]**

**6.7**     **Maintenance of Perfected Security Interests; Further Documentation.**  Each Borrower shall take all such actions reasonably requested by Lender to maintain the security interests created by this Agreement as first priority perfected security interests (subject to Permitted Liens) and shall defend such security interest against the claims and demands of all Persons whomsoever.  Each Borrower will furnish to Lender from time to time statements and schedules further identifying and describing the assets and property of such Borrower and such other reports in connection therewith as Lender may reasonably request, all in reasonable detail.

**6.8**     **Changes in Locations, Name, etc.**  No Borrower shall change its jurisdiction of organization or the location of its chief executive office from that specified on Schedule 6.8 hereto, or change its name, identity or corporate or other organizational structure, in each case except upon fifteen (15) days' prior written notice to Lender and delivery to Lender of all additional financing statements and other documents reasonably requested by Lender as to the validity, perfection and priority of the security interests provided for herein.

**6.9**     **Further Assurances**.  At any time and from time to time Borrowers shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to effectuate the purposes of this Agreement.

**6.10**     **Use of Proceeds**.  Borrower shall use the proceeds of the Loan to pay certain closing costs for the Loan and other expenses, and for working capital and other general corporate purposes.

23

## 7.    NEGATIVE COVENANTS.

Until the Facility Termination Date, each Borrower agrees that it shall not, and shall not permit any Subsidiary to:

**7.1    Dispositions**.  Convey, sell, lease, transfer or otherwise dispose of all or any part of its business or property, other than:  (i)  sales or dispositions of worn-out or obsolete Equipment no longer used or useful in the business of Borrowers; and (ii) sales or dispositions which in the aggregate do not exceed Fifty Thousand Dollars ($50,000) in any fiscal year.

**7.2    Mergers or Acquisitions**.  Merge or consolidate with or into any other business organization, or acquire all or substantially all of the Equity Interests or property of another Person, except (i) a Subsidiary may merge or consolidate with or into a Borrower (provided that the applicable Borrower is the surviving entity) and (ii) acquisitions of all or substantially all of the Equity Interests or property of another Person where the aggregate consideration paid in connection with such acquisition does not exceed Fifty Thousand Dollars ($50,000) in any fiscal year.

**7.3    Indebtedness**.  Create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness.

**7.4    Liens**.  Create, incur, assume or suffer to exist any Lien with respect to any of its property, other than Permitted Liens.

**7.5    Restricted Payments**.  Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any Equity Interests.

**7.6    Investments**.  Directly or indirectly acquire or own, or make any Investment in or to any Person, other than Permitted Investments.

**7.7    Transactions with Affiliates**.  Directly or indirectly enter into or permit to exist any transaction with any Affiliate except for transactions that are in the ordinary course of such Borrower's business, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

**7.8    [Reserved.]**

**7.9    Compliance**.  Become an "investment company" or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of the Loan for such purpose; or fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, each as defined in ERISA, or violate any law or regulation, which violation could reasonably be expected to have a Material Adverse Effect.

**7.10    Restrictive Agreements**.  Directly or indirectly, enter into, incur or permit to exist any agreement that prohibits, restricts or imposes any condition upon (a) the ability of any Borrower or any Subsidiary to create, incur or permit any Lien upon any of its assets or properties in favor of Lender, whether now owned or hereafter acquired, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to its Equity Interests, to make or repay loans or advances to any Borrower or any Subsidiary, to guarantee Indebtedness of Borrower or any Subsidiary or to transfer any of its property or assets to any Borrower or any Subsidiary, except: (i) restrictions or conditions imposed

by law or by this Agreement or any other Loan Document or in connection with any document or instrument governing Permitted Liens (<u>provided</u>, that such restrictions only extend to the property subject to such Permitted Liens and do not prohibit a Borrower from granting a security interest in such Borrower's Collateral in favor of Lender); and (ii) customary restrictions or encumbrances imposed pursuant to any agreement entered into for the purpose of effecting a transfer or disposition permitted under <u>Section 7.1</u>.

**7.11    <u>Change in Business; Accounting Principles or Fiscal Year End</u>**.  Engage in any business other than the businesses currently engaged in by Borrowers on the Closing Date and any business substantially similar or related thereto (or incidental thereto); or without Lender's prior written consent, change its accounting principles or the date on which its fiscal year ends.

**7.12    <u>Sanctions and Anti-Corruption Laws</u>**.    Borrowers will not, nor will any Borrower permit any Subsidiary to, directly or indirectly, use the proceeds of the Loan, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, (ii) in any other manner  that would result in a violation of Sanctions by any Person (including any Person participating in the Loan, whether as Lender, underwriter, advisor, investor or otherwise), or (iii) in furtherance of an offer, payment, promise to pay or authorization of the payment or giving of money  or anything else of value to any Person in violation of applicable Anti-Corruption Laws.

## 8.    EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an "<u>Event of Default</u>" under this Agreement:

**8.1    <u>Payments</u>**.  (a) If any Borrower fails to pay, when due, any principal due and payable under this Agreement, or (b) if any Borrower fails to pay, when due, any interest or other amounts due and payable under this Agreement or any other portion of the Obligations; or

**8.2    <u>Covenants</u>**.

(a)    If any Borrower fails to perform any obligation or violates any covenant contained in <u>Section 6</u> or <u>Section 7</u> of this Agreement; or

(b)    If any Borrower fails or neglects to perform or observe or violates any other term, provision, condition, covenant contained in this Agreement (other than as otherwise specified in this <u>Section 8</u>), or any Borrower or any Obligor fails or neglects to perform or observe any term, provision, condition, or covenant contained in any of the other Loan Documents, and as to any default under such other term,  provision, condition or covenant that can be cured, has failed to cure such default within fifteen (15) days after the earlier to occur of (i) any Borrower's or the applicable Obligor's receipt of notice thereof from Lender, or (ii) the applicable Obligor or any Responsible Officer of any Borrower or the applicable Obligor becoming aware thereof; or

**8.3    <u>Material Adverse Effect</u>**.  The occurrence of a Material Adverse Effect; or

**8.4    <u>Attachment</u>**.  If any material portion of any Collateral is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or Person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within twenty (20) days, or if any Obligor is

enjoined, restrained, or in any way prevented by court order from continuing to conduct all or a material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any portion of any Collateral (other than Liens permitted by the Loan Documents), or if a notice of lien, levy, or assessment is filed of record with respect to any Collateral by any Governmental Authority, and the same is not paid within twenty (20) days after Borrower or the applicable Obligor receives notice thereof; or

8.5    **Insolvency**.  If any Obligor is adjudicated insolvent, or if an Insolvency Proceeding is commenced by any Obligor, or if an Insolvency Proceeding is commenced against any Obligor and is not dismissed or stayed within sixty (60) days; or

8.6    **Other Agreements**.  If there is a default or other failure to perform in any agreement to which any Obligor is a party or by which it is bound either (a) resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of Fifty Thousand Dollars ($50,000), or (b) which otherwise could reasonably be expected to have a Material Adverse Effect; or

8.7    **Judgments**.  If a judgment or judgments (a) for the payment of money in an amount, individually or in the aggregate, of at least Fifty Thousand Dollars ($50,000) (to the extent not covered by independent third-party insurance), or (b) which individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect, shall be rendered against any Obligor and shall remain unsatisfied and unstayed for a period of thirty (30) days; or

8.8    **Misrepresentations**.  Any Obligor or any Person acting for any Obligor makes any representation, warranty, or other statement now or later in this Agreement, any Loan Document or in any writing delivered to Lender or to induce Lender to enter this Agreement or any Loan Document, and such representation, warranty, or other statement is false or misleading in any material respect when made; or

8.9    **Cessation of Business.**  Any Obligor shall commence dissolution proceedings or otherwise shall cease operation of its business as conducted on the date hereof; or

8.10    **Loan Documents.**  Any material provision of this Agreement or any other Loan Document shall for any reason cease to be valid and binding on, or enforceable against, any Obligor, or any Obligor shall so state in writing, or any Obligor shall bring an action to terminate its obligation under this Agreement or any other Loan Document; or

8.11    **Liens.**  Any Lien on the Collateral in favor of Lender purported to be created under this Agreement or any other Loan Document, shall fail or cease to be, or shall be asserted by any Obligor not to be, a valid and perfected Lien in favor of Lender, with the priority required by the applicable Loan Documents (subject to Permitted Liens); or

8.12    **Subordination Agreements; Non-Disturbance Agreements**.  (i) The Related Party Subordination Agreement, any Third Party Subordination Agreement or any other subordination agreement made in favor of the Lender shall cease to be in full force and effect or the validity or enforceability thereof is disaffirmed by or on behalf of any subordinated lender party thereto, or (ii) any Non-Disturbance Agreement or any other non-disturbance agreement made in favor of the Lender shall cease to be in full force and effect or the validity or enforceability thereof is disaffirmed by or on behalf of any non-Lender party thereto; or

8.13    **Change of Control.**  The occurrence of any Change of Control.

110220598

## 9.    LENDER'S RIGHTS AND REMEDIES.

**9.1    Rights and Remedies**.  Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by Borrowers:

(a)    Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable (provided that upon the occurrence of an Event of Default described in Section 8.4 (Insolvency), all Obligations shall become immediately due and payable without any action by Lender);

(b)    Exercise any rights and remedies available hereunder, under the other Loan Documents, or under applicable law or equity, with respect to Borrowers, the Collateral, or otherwise;

(c)    Settle or adjust disputes and claims directly with Account Debtors for amounts, upon terms and in whatever order that Lender reasonably considers advisable;

(d)    Make such payments and do such acts as Lender considers necessary or reasonable to protect its security interest in the Collateral.  Each Borrower agrees to assemble the Collateral if Lender so requires, and to make the Collateral available to Lender as Lender may designate. Each Borrower authorizes Lender to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien which in Lender's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith.  With respect to any Borrower's owned premises, such Borrower hereby grants Lender a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Lender's rights or remedies provided herein, at law, in equity, or otherwise;

(e)    Set off and apply to the Obligations in such order as Lender shall determine in its sole discretion any and all (i) balances and deposits of any Borrower held by Lender, including, without limitation, balances held in the Specified Collateral Proceeds Account and the Administrative Account, or (ii) indebtedness at any time owing to or for the credit or the account of any Borrower held by Lender;

(f)    Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral.  Lender is hereby granted a license or other right, solely pursuant to the provisions of this Section 9.1, to use, without charge, each Borrower's labels, Patents, Copyrights, rights of use of any name, trade secrets, trade names, Trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Lender's exercise of its rights under this Section 9.1, each Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit;  and

(g)    Dispose of the Collateral by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including each Borrower's premises) as Lender determines is commercially reasonable, and apply any proceeds to the Obligations in whatever manner or order Lender deems appropriate and Lender may credit bid and purchase at any public sale.  Any deficiency that exists after disposition of the Collateral by Lender will be due and payable immediately by Borrowers.

**9.2    Application of Proceeds.**  All proceeds from each sale of, or other realization upon, all or any part of the Collateral by Lender after an Event of Default has occurred and is continuing

110220598

shall be applied as follows: (a) <u>first</u>, to Lender's fees and reimbursable expenses then due and payable pursuant to any of the Loan Documents; (b) <u>second</u>, to interest then due and payable hereunder; (c) <u>third</u>, to the principal balance of the Loan, until the same shall have been paid in full; and (d) <u>fourth</u>, to the extent any proceeds remain, to Borrowers or as otherwise provided by a court of competent jurisdiction.

    **9.3**  **Power of Attorney.** Exercisable only upon the occurrence and during the continuance of an Event of Default, each Borrower hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees) as such Borrower's true and lawful attorney to: (a) send requests for verification of Accounts or notify Account Debtors of Lender's security interest in the Accounts; (b) receive and open all mail addressed to Borrower for the purpose of collecting the Accounts; (c) notify all Account Debtors with respect to the Accounts to pay Lender directly; (d) endorse such Borrower's name on any checks or other forms of payment or security that may come into Lender's possession; (e) sign such Borrower's name on any invoice or bill of lading relating to any Account, drafts against Account Debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to Account Debtors; (f) make, settle, and adjust all claims under and decisions with respect to such Borrower's policies of insurance; (g) demand, collect, receive, sue, and give releases to any Account Debtor for the monies due or which may become due upon or with respect to the Accounts and to compromise, prosecute, or defend any action, claim, case or proceeding relating to the Accounts; (h) settle and adjust disputes and claims respecting the accounts directly with Account Debtors, for amounts and upon terms which Lender determines to be reasonable; (i) sell, assign, transfer, pledge, compromise, discharge or otherwise dispose of any Collateral; (j) execute on behalf of such Borrower any and all instruments, documents, financing statements and the like to perfect Lender's interests in the Accounts and collections and file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral; and (k) do all acts and things necessary or expedient, in furtherance of any such purposes. The appointment of Lender as such Borrower's attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed.

    **9.4**  **Accounts Collection**. During the continuance of an Event of Default, Borrowers shall collect all amounts owing to any Borrower for Lender, receive in trust all payments as Lender's trustee, and immediately deliver such payments to Lender in their original form as received from the Account Debtors, with proper endorsements for deposit.

    **9.5**  **Payments by Lender**. If any Borrower fails to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then Lender may do any or all of the following after reasonable notice to any Borrower: (a) make payment of the same or any part thereof; (b) set up such reserves as Lender deems necessary to protect Lender from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type described in <u>Section 6.5</u> of this Agreement, and take any action with respect to such policies as Lender deems prudent. Any amounts so paid or deposited by Lender shall constitute Obligations, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Lender shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Event of Default under this Agreement.

    **9.6**  **Lender's Liability for Collateral**. So long as Lender complies with reasonable banking practices and applicable law regarding the safekeeping of the Collateral in the possession or under the control of Lender, Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier,

110220598

warehouseman, bailee, forwarding agency, or other Person whomsoever.  All risk of loss, damage or destruction of the Collateral shall be borne by Borrowers.

**9.7**  **Remedies Cumulative**.  Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative.  Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on any Borrower's part shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.  No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the instance and for the purpose for which it was given.

**9.8**  **Demand; Protest**.  Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which any Obligor may in any way be liable.

## 10.  NOTICES.

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or electronic mail to Borrower or to Lender, as the case may be, at its addresses set forth below:

|  |  |
|---|---|
| If to Borrower: | Hoplite Entertainment, Inc. |
|  | Hoplite, Inc. |
|  | c/o James D. Pacitti, Esq. |
|  | Law Office of James D. Pacitti |
|  | 9107 Wilshire Boulevard, Suite 450 |
|  | Beverly Hills, California 90210 |
|  |  |
| If to Lender: | Bay Point Capital Partners II, LP |
|  | 3050 Peachtree Road NW, Suite 2 |
|  | Atlanta, GA 30305 |
|  | Attn:  Charles Andros |
|  | Email:  charlesandros@bay-pointadvisors.com |

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

## 11.  GENERAL PROVISIONS.

**11.1**  **Waiver; Amendments; Integration.**  No delay on the part of Lender in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy.  Neither this Agreement nor the Loan Documents can be amended or terminated orally.  No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement or the other Loan Documents shall in any event be effective unless the same shall be in writing and agreed by Lender, and then any such amendment, modification, waiver or consent

shall be effective only in the specific instance and for the specific purpose for which given.  All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

**11.2**    **Confirmations.**    Borrowers and Lender agree from time to time, upon written request received by it from the other, to confirm to the other in writing the aggregate unpaid principal amount of the Loan then outstanding.

### 11.3    Assignments; Participations.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender.  No other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.

(b)    Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement.

(c)    From and after the effective date of any assignment by Lender of all or any portion of its interest hereunder, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by Lender, have the rights and obligations of Lender under this Agreement, and Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of Lender's rights and obligations under this Agreement, Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.6, 2.7, and 11.14 with respect to facts and circumstances occurring prior to the effective date of such assignment.  If the consent of Borrower to an assignment is required hereunder (including a consent to an assignment which does not meet the minimum assignment thresholds specified above), Borrower shall be deemed to have given its consent unless it shall object thereto by written notice to Lender within five (5) Business Days after notice thereof has actually been delivered by Lender to Borrower.

(d)    Lender may at any time, without the consent of, or notice to, any Borrower, sell participations to any Person (each, a "Participant") in all or a portion of Lender's rights and/or obligations under this Agreement (including all or a portion of its Loan owing to it); provided that (i) Lender's obligations under this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrowers shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement. Each Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.6 and 2.7 to the same extent as if it were Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.7 as though it were Lender; provided if such Participant, by exercising any right of set-off or counterclaim or otherwise, obtains payment in respect of any principal of or interest on its participation in the Obligations that would result in such Participant receiving payment of a greater proportion of the aggregate amount of its Obligations than the proportion received by Lender with respect to the Obligations, then the Participant shall purchase (for cash at face value) participations in the Obligations of Lender to the extent necessary so that the benefit of all such payments shall be shared by Lender and the Participant ratably in accordance with the aggregate amount of principal of and accrued interest on their

respective interests in the Obligations; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this subsection shall not be construed to apply to any payment made by Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by Lender as consideration for the assignment of or sale of a participation in any of its interest in the Obligations to any assignee or Participant, other than to any Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this subsection shall apply).  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that Lender acquiring a participation pursuant to the foregoing arrangements may exercise against any Borrower rights of set-off and counterclaim with respect to such participation as fully as if Lender were a direct creditor of such Borrower in the amount of such participation.  If Lender sells a participation, it shall, acting solely for this purpose as a non-fiduciary agent of Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loan or other obligations under the Loan Documents (the "Participant Register"); provided that Lender shall not have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in the Loan or any other obligation under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this agreement notwithstanding any notice to the contrary.

**11.4    Costs, Expenses**.  Each Borrower agrees to pay promptly after demand therefor, all reasonable and documented out-of-pocket costs and expenses of Lender in connection with the preparation, execution, delivery and administration (including perfection and protection of any Collateral, if applicable) of this Agreement, the other Loan Documents and all other documents provided for herein or delivered or to be delivered hereunder or in connection herewith (including any amendment, supplement or waiver to any Loan Document), whether or not the transactions contemplated hereby or thereby shall be consummated, and all reasonable and documented out-of-pocket costs and expenses incurred by Lender after an Event of Default in connection with the collection of the Obligations or the enforcement of this Agreement the other Loan Documents or any such other documents or during any workout, restructuring or negotiations in respect thereof.  All Obligations provided for in this Section 11.4 shall survive repayment of the Obligations and termination of this Agreement and shall be secured by the Collateral.

**11.5    Administrative Deposit**.  Borrowers agree to establish an administrative deposit into an account maintained by Lender for the benefit of Lender in an amount of Five Thousand and No/100 Dollars ($5,000.00) for any expenses incurred by Lender during the term of this Agreement (the "Administrative Account"). Lender will provide Borrowers with documentation supporting any costs deducted from this deposit in connection with the deduction thereof. Any remaining balance of such deposit shall be returned to Borrower upon the Facility Termination Date.

**11.6    Governing Law; Jurisdiction; Consent to Service of Process**.

(a)    This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be construed in accordance with and be governed by the law (without giving effect to the conflict of law principles thereof) of the State of Georgia.

31

(b)     Each Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court for the Northern District of Georgia, and of the Business Case Division of the Fulton County Superior Court located in Atlanta, Georgia, and of any appellate court from any thereof, in each case in any action or proceeding arising out of or relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court or, to the extent permitted by applicable law, such appellate court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Borrower or its properties in the courts of any jurisdiction.

(c)     Each Borrower irrevocably and unconditionally waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding described in subsection (b) of this Section and brought in any court referred to in subsection (b) of this Section. Each of the parties hereto irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to the service of process in the manner provided for notices in <u>Section 10</u>.  Nothing in this Agreement or in any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by law.

**11.7     <u>Right of Set-off</u>.**  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, Lender shall have the right, at any time or from time to time upon the occurrence and during the continuance of an Event of Default, without prior notice to any Borrower, any such notice being expressly waived by each Borrower to the extent permitted by applicable law, to set off and apply against all deposits (general or special, time or demand, provisional or final) of any Borrower at any time held or other obligations at any time owing by Lender to or for the credit or the account of any Borrower against any and all Obligations held by Lender, irrespective of whether Lender shall have made demand hereunder and although such Obligations may be unmatured. Lender agrees promptly to notify Borrower after any such set-off and any application made by Lender; <u>provided</u> that the failure to give such notice shall not affect the validity of such set-off and application.

**11.8     <u>Severability</u>.**  Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**11.9     <u>Nature of Remedies</u>.**  All Obligations of Borrower and rights of Lender expressed herein or in any other Loan Document shall be in addition to and not in limitation of those provided by applicable law.  No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**11.10     <u>Entire Agreement</u>.**  This Agreement, together with the other Loan Documents, embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the

110220598

subject matter hereof and thereof and any prior arrangements made with respect to the payment by Borrower of (or any indemnification for) any fees, costs or expenses payable to or incurred (or to be incurred) by or on behalf of Lender.

         **11.11    Counterparts.**  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement. Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.  Electronic records of executed Loan Documents maintained by Lender shall deemed to be originals.

         **11.12    Captions.**  Section captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

         **11.13    USA Patriot Act Notice.**  Lender (for itself and not on behalf of any other party) hereby notifies Borrower that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "<u>Patriot Act</u>"), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrowers and other information that will allow Lender, as applicable, to identify Borrower in accordance with the Patriot Act.

         **11.14    <u>INDEMNIFICATION BY BORROWERS</u>. IN CONSIDERATION OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY LENDER AND THE AGREEMENT BY LENDER TO EXTEND THE LOAN PROVIDED HEREUNDER, EACH BORROWER HEREBY AGREES TO INDEMNIFY, EXONERATE AND HOLD LENDER AND EACH OF THE OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES AND AGENTS OF LENDER (EACH A "<u>LENDER PARTY</u>") FREE AND HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, LOSSES, LIABILITIES, DAMAGES AND EXPENSES (COLLECTIVELY, THE "<u>INDEMNIFIED LIABILITIES</u>"), INCURRED BY LENDER PARTIES OR ANY OF THEM AS A RESULT OF, OR ARISING OUT OF, OR RELATING TO (A) ANY PURCHASE OF ASSETS, EQUITY INTERESTS, OR OTHER SIMILAR TRANSACTION FINANCED OR PROPOSED TO BE FINANCED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, WITH THE PROCEEDS OF ANY OF THE LOAN, (B) THE USE, HANDLING, RELEASE, EMISSION, DISCHARGE, TRANSPORTATION, STORAGE, TREATMENT OR DISPOSAL OF ANY HAZARDOUS SUBSTANCE AT ANY PROPERTY OWNED OR LEASED BY ANY BORROWER, (C) ANY VIOLATION OF ANY ENVIRONMENTAL LAWS WITH RESPECT TO CONDITIONS AT ANY PROPERTY OWNED OR LEASED BY BORROWER OR THE OPERATIONS CONDUCTED THEREON, (D) THE INVESTIGATION, CLEANUP OR REMEDIATION OF OFFSITE LOCATIONS AT WHICH ANY BORROWER OR ITS RESPECTIVE PREDECESSORS ARE ALLEGED TO HAVE DIRECTLY OR INDIRECTLY DISPOSED OF HAZARDOUS SUBSTANCES OR (E) THE EXECUTION, DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BY ANY OF LENDER PARTIES, EXCEPT FOR ANY SUCH INDEMNIFIED LIABILITIES ARISING ON ACCOUNT OF THE APPLICABLE LENDER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION.  IF AND TO THE EXTENT THAT THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, BORROWER HEREBY AGREES TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION OF EACH OF THE INDEMNIFIED LIABILITIES WHICH IS PERMISSIBLE UNDER APPLICABLE LAW.  ALL OBLIGATIONS PROVIDED FOR IN THIS <u>SECTION 11.14</u>**

**SHALL SURVIVE REPAYMENT OF THE OBLIGATIONS, ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF THE COLLATERAL AND TERMINATION OF THIS AGREEMENT.**

          **11.15**   **Nonliability of Lender.**  The relationship between Borrowers on the one hand and Lender on the other hand shall be solely that of borrower and lender.  Lender has no fiduciary relationship with or duty to any Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Borrower, on the one hand, and Lender, on the other hand, in connection herewith or therewith is solely that of debtor and creditor.  Lender undertakes no responsibility to Borrowers to review or inform any Borrower of any matter in connection with any phase of such Borrower's business or operations.  Each Borrower agrees that Lender shall have no liability to any Borrower (whether sounding in tort, contract or otherwise) for losses suffered by such Borrower in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought.  **NO LENDER PARTY SHALL HAVE ANY LIABILITY WITH RESPECT TO, AND EACH BORROWER HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE FOR ANY SPECIAL, PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE CLOSING DATE).**  Each Borrower acknowledges that it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party.  No joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby between each Borrower and Lender.

          **11.16**   **WAIVER OF JURY TRIAL.**  EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.16</u>.

          **11.17**   **Confidentiality.**  Each Borrower and Lender hereby agrees to keep all information regarding the terms set forth in this Agreement and the other Loan Documents (the "<u>Confidential Terms</u>") confidential and shall not divulge any Confidential Terms to any Person without the prior written consent of Lender and/or Borrower, as applicable, except to the extent that (i) it is necessary to do so in working with legal counsel, auditors, taxing authorities, or other governmental agencies or regulatory bodies, or in order to comply with any applicable federal or state laws including, without limitation, federal securities laws applicable to Borrower, Lender or any respective Affiliate thereof, or (ii) any of the Confidential Terms are in the public domain other than due to a breach of this covenant (such as recording Loan Documents pursuant to the terms thereof, etc.); <u>provided</u>, however, that nothing herein shall prevent any party from disclosing any such information to its affiliates, employees, directors, agents, attorneys, accountants, or other professional advisors deemed necessary or appropriate in the reasonable judgment of the disclosing party, in each case, who are made aware of and instructed to

34

comply with the provisions of this <u>Section 11.17</u>; and, <u>provided</u>, <u>further</u>, no disclosure made with respect to this Agreement shall include a copy of this Agreement to the extent that a summary would suffice in lieu thereof.  In this connection, Borrowers and Lender shall not issue any press releases referencing or regarding the Confidential Terms without the prior review and written consent to such issuance by Lender and/or Borrower, as applicable.  The provisions set forth in this Section shall survive the termination of this Agreement for a period of one year following such termination.

      **11.18**    <u>**Time of Essence**</u>.  Time is of the essence for the performance of all obligations set forth in this Agreement.

      **11.19**    <u>**Survival**</u>.  All covenants, representations and warranties made in this Agreement shall continue in full force and effect until the Facility Termination Date.  The obligations of Borrowers to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in <u>Section 11.14</u> shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

      [*Remainder of page intentionally blank; signature pages follow.*]

110220598

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**BORROWERS:**

HOPLITE ENTERTAINMENT, INC.

By: _____
Name: _____
Title: _____

HOPLITE, INC.

By: _____
Name: _____
Title: _____

**LENDER:**

BAY POINT CAPITAL PARTNERS II, LP

By: _____
Name:
Title:

LOAN AND SECURITY AGREEMENT
SIGNATURE PAGE

110220598

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**BORROWERS**:

HOPLITE ENTERTAINMENT, INC.

By: _____
Name:
Title:

HOPLITE, INC.

By: _____
Name:
Title:

**LENDER**:

BAY POINT CAPITAL PARTNERS II, LP

By: _____
Name:  Charles Andros
Title:  Authorized Signatory

110220598

<u>Exhibit A</u>

**Exhibit A**

**<u>Form of Note</u>**

<u>NOTE</u>

$2,000,000.00                                                September 30, 2020

FOR VALUE RECEIVED, HOPLITE ENTERTAINMENT, INC., a California corporation ("<u>Entertainment</u>"), and HOPLITE, INC., a California corporation ("<u>Hoplite</u>"), jointly and severally, as borrowers (Entertainment and Hoplite collectively, the "<u>Borrowers</u>" and each, a "<u>Borrower</u>"), promise to pay to the order of BAY POINT CAPITAL PARTNERS II, LP, a Delaware limited partnership (together with its successors and assigns, "<u>Lender</u>"), as lender under that certain Loan and Security Agreement, dated of even date herewith, between Borrower and Lender (as amended, modified, renewed, replaced, supplemented, or restated from time to time, the "<u>Loan Agreement</u>"), at the office of Lender located at 3050 Peachtree Road NW, Suite 740, Atlanta, GA 30305, the principal sum of TWO MILLION HUNDRED THOUSAND AND NO/100 DOLLARS ($2,000,000.00) (the "<u>Principal Sum</u>"), on the dates and in the amounts provided in the Loan Agreement.  Capitalized terms not otherwise defined herein shall have the meanings given thereto in the Loan Agreement.

Borrowers promise to pay interest on the unpaid Principal Sum from time to time on the dates and at the rate or rates provided for in the Loan Agreement and in all cases in accordance with the terms of the Loan Agreement.  Interest on any overdue Principal Sum shall accrue at a rate per annum as provided in the Loan Agreement.  The outstanding Principal Sum, together with all accrued unpaid interest thereon, shall be due and payable as set forth in the Loan Agreement, and, unless sooner paid, the entire outstanding Principal Sum shall be due and payable in full on the Maturity Date.  All such payments of principal and interest shall be made in lawful money of the United States in immediately available funds at the office of Lender designated above or otherwise specified by Lender from time to time pursuant to the Loan Agreement.

All repayments of the Principal Sum shall be recorded by Lender and, prior to any transfer hereof, endorsed by Lender on a schedule attached hereto, or on a continuation of such schedule attached to and made a part hereof; <u>provided</u> that the failure of Lender to make, or any error of Lender in making, any such recordation or endorsement shall not affect the obligations of Borrowers hereunder or under the Loan Agreement.

This Note (this "<u>Note</u>") is a Loan Document and is the "Note" referred to in, and is entitled to the benefits of, the Loan Agreement which, among other things, contains provisions for the acceleration of the maturity hereof upon the happening of certain events, for prepayment of the Principal Sum prior to the maturity hereof and for the amendment or waiver of certain provisions of the Loan Agreement, all upon the terms and conditions therein specified.  The obligations evidenced by the Note are secured by the Collateral, in accordance with the terms and conditions of the Loan Agreement.

If an Event of Default shall occur and be continuing, the entire unpaid Principal Sum and all of the unpaid interest accrued thereon may become or be declared due and payable in the manner and with the effect provided in the Loan Agreement.

110278256

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, demand, protest, notice of demand, dishonor, protest and nonpayment and any other notice required by law relative hereto, except to the extent as otherwise may be expressly provided for in the Loan Documents.  Without limiting the generality of the foregoing, the acceptance by Lender from time to time of any payment under this Note which is past due or which is less than the payment in full of all amounts due and payable at the time of such payment shall not (i) constitute a waiver of or impair or extinguish the right of Lender to accelerate the maturity of the Obligations or to exercise any other right or remedy at the time or at any subsequent time, or nullify any prior exercise of any such right or remedy, or (ii) constitute a waiver of the requirement of punctual payment and performance or a novation in any respect.

The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the successors and assigns of the parties.  The foregoing sentence shall not be construed to permit any Borrower to assign the Note except as otherwise permitted under the Loan Agreement.  As further provided in the Loan Agreement, Lender may, at any time, sell, transfer, or assign all on a portion of its interest in this Note and the other Loan Documents, subject to the terms of the Loan Agreement.

Time is of the essence with respect to Borrowers' obligations under this Note.  A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.  This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought.  Any notice, request, or demand to or upon Borrower or Lender shall be deemed to have been properly given or made when delivered in accordance with the Loan Agreement.

Borrowers agree, in the event that this Note or any portion hereof is collected by law or through an attorney at law, to pay all reasonable costs of collection, including, without limitation, attorneys' fees actually incurred, in accordance with the terms and conditions of the Loan Agreement.  This Note shall be construed in accordance with and governed by the laws of the State of Georgia, without regard to the conflict of law principles thereof.

*[Remainder of page intentionally blank; signature page follows.]*

IN WITNESS WHEREOF, each Borrower has caused this Note to be duly executed under seal, by its duly authorized officer as of the day and year first above written.

HOPLITE ENTERTAINMENT, INC.

By: _____
Name:
Title:

HOPLITE, INC.

By: _____
Name:
Title:

Exhibit B

**Form of Compliance Certificate**

To:    Bay Point Capital Partners II, LP
        3050 Peachtree Road NW, Suite 740
        Atlanta, GA 30305
        Attn:  Charles Andros

Ladies and Gentlemen:

       Reference is made to that certain Loan and Security Agreement, dated as of September 30, 2020 (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"), by and among HOPLITE ENTERTAINMENT, INC., a California corporation ("Entertainment"), and HOPLITE, INC., a California corporation ("Hoplite", together with Entertainment, the "Borrowers", each, a "Borrower"), jointly and severally, as borrowers, and BAY POINT CAPITAL PARTNERS II, LP, a Delaware limited partnership (together with its successors and assigns, "Lender").  Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Loan Agreement.

       The undersigned, the duly elected, qualified, and acting **[_____]**of the Borrower Representative, hereby certifies to Lender as follows:

       1.     The consolidated and consolidating financial statements of Borrowers and its Subsidiaries (if any), attached hereto for the calendar month ended **[_____]** (the "Reporting Date") present fairly in all material respects the financial condition of each Borrower and its Subsidiaries (if any), as of the end of such calendar month on a consolidated and consolidating basis, and the related statements of operations of each Borrower and its Subsidiaries (if any), for such calendar month, in accordance with generally accepted accounting principles consistently applied (subject, in the case of such monthly financial statements, to normal year-end adjustments and the absence of footnotes).

       2.     Based upon a review of the activities of  each Borrower and any Subsidiary and the financial statements attached hereto during the period covered thereby, as of the date hereof, **[there exists no Default or Event of Default.][the following Default(s) or Event(s) of Default exist, and the applicable Borrower has taken or propose to take the following actions with respect thereto: _____.]**

*[Remainder of page intentionally blank; signature page follows]*

110220598

The undersigned has executed and delivered this Compliance Certificate as of
_____, 20__.

HOPLITE ENTERTAINMENT, INC.


By: _____
Name:
Title:


HOPLITE, INC.


By: _____
Name:
 Title:

Exhibit C

**Specified Collateral Proceeds Account**

WIRE INSTRUCTIONS

For domestic wires:

SunTrust Bank, Atlanta
Routing and Transit: #061000104
MENDENFREIMAN LLP
IOLTA
Escrow Account: #1000131228917

For international wires:

SunTrust Bank, Atlanta
Routing and Transit: #061000104
MENDENFREIMAN LLP
IOLTA
Escrow Account: #1000131228917
SWIFT code: SNTRUS3A

## **Schedule 5.6**

<u>Litigation</u>

None

## **Schedule 5.8**

### Prior Names

None

## **Schedule 5.13**

Equity Interests and Subsidiaries

Hoplite, Inc.:
100% of shares owned by Jonathan Lee Smith

Hoplite Entertainment, Inc.:
40% of shares owned by Jonathan Lee Smith;
32% of shares owned by Robert Lee;
10% of shares owned by Tony Lord;
9% of shares owned by Jonathan Perkins; and
9% of shares owned by Jenilee Reyes.

## **Schedule 6.8**

### Jurisdiction; Chief Executive Office

Jurisdiction of Organization:
California


Chief Executive Office:
6725 Sunset Boulevard, Suite 250
Los Angeles, CA 90028

## **Schedule 7.4**

<u>Liens</u>

All liens arising under the Related Party Loans, the SBA Loan, and the Third Party Loans.