# EXHIBIT T

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION

 3   BAY POINT CAPITAL PARTNERS    )
     II, LP,                       )
 4                                 )
                  Plaintiff,       )  CRIMINAL ACTION FILE
 5           v.                    )  NO. 1:21-CV-00375-MLB
                                   )
 6   HOPLITE, INC. ET AL,          )
                                   )
 7                Defendants.      )
     _____)
 8

 9

10   ----------------------------------------------------------

11         BEFORE THE HONORABLE MICHAEL L. BROWN
                   TRANSCRIPT OF PROCEEDINGS
12                    FEBRUARY 10, 2021
     ----------------------------------------------------------
13

14

15

16
            Proceedings recorded by mechanical stenography
17            and computer-aided transcript produced by

18
             JANA B. COLTER, FAPR, RMR, CRR, CRC
19                   Official Court Reporter
                     1949 U.S. Courthouse
20                   75 Ted Turner Drive, SW
                     Atlanta, Georgia  30303
21                      (404) 215-1456

22

23

24

25
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF GEORGIA
```

1            MR. WINSBERG:  No, Your Honor.

2            THE COURT:  Okay.  I'm going to short circuit this.

3  Does the defense have any witnesses on the issue of fraud?

4            MR. COHAN:  I do not, Your Honor.

5            THE COURT:  Does anybody want to make an argument

6  about the issue of whether there is evidence of fraud?

7            MR. COHAN:  I'd like to.

8            THE COURT:  Go ahead.  I'll lay out what I think, and

9  then you can respond to that.  That will give you a better

10 target.

11           I think there's lots of evidence of fraud.  From what

12 I've heard, I think this witness was very credible in what he

13 said.  I think there was the representations that were made in

14 O, Exhibit O, particularly in regards to Big Media and

15 Screen Media having an obligation at that time to pay were

16 fraudulent.

17           We know that's the case with Mr. Needle, because of

18 what we see in the email in which he explains that

19 Paragraph 2(c) was not even part of the agreement, or when he

20 provides the agreement, it does not have that, so I think

21 there's clear evidence of fraud right there by Mr. Smith.

22           The sort of allegation, the overarching allegation,

23 that they're owed about $3.4 million from three different

24 companies and that that payment was fairly imminent, 30 to 60

25 days, I think is what the witness explained, I think that was a

1  misrepresentation, a fraudulent misrepresentation, given the
2  other things that I'll say.
3           The false document I've already mentioned in
4  Exhibit C provides a reason to find that there is fraud here.
5           The false ACH transfers that were provided in J and K
6  provide reason to believe that there was fraud here.
7           The misleading document provided by
8  Columbia State Bank, allegedly subrogating their claim, when
9  you compare that to -- I think that's M and if you compare it
10 to V, and you listen to what Ms. Godfrey said in her email and
11 today, that it just simply was not signed by their people, yet
12 it was presented by the defendant, I believe it was the
13 defendant that provided that, right?  It wasn't the
14 intermediary, right?
15          MR. WINSBERG:  Yes, Your Honor.
16          THE COURT:  Is that right, Mr. Rierson?
17          THE WITNESS:  Yes, sir.
18          THE COURT:  Okay.  The repeated statement that he
19 would pay liens, tax liens after closing that were never done.
20          The ruse that he concocted to allow Mr. Rierson to
21 believe that he was speaking to Mr. Needle at Screen Media to
22 validate what was owed, and then Mr. Rierson learns later that
23 he never spoke to Mr. Needle and for all evidence never spoke
24 to anybody at Screen, because the things that he was told by
25 the alleged Screen representative, that was supposed to be

1  Mr. Needle, were not true.  And maybe that happened with the
2  other two.  We don't know.  What we do know is that Mr. Smith
3  set up that phone call, made the introduction, and did it for
4  the purpose of misleading Mr. Rierson, and to the effect of
5  misleading him.
6           Change of the terms in the forbearance agreement,
7  that's maybe not fraudulent, because at least let the guy catch
8  it, but it's pretty outside the realm of normal behavior.
9           And the failure to give access to the financial
10 statements, I think there's reason to believe there's
11 fraudulent intent there.
12          So if you could address those issues for me,
13 particularly the delta between what apparently Mr. Smith said
14 and what actually wound up being true, I'd like to clear that
15 issue first before we move on to what I think are more
16 difficult issues.  I don't think the fraud issue is a close
17 call here.
18          I suspect if your client was here, he might be taking
19 the Fifth, I don't know.  But I suspect if he was on the
20 witness stand, he might be doing that.
21          MR. COHAN:  Judge, I would say about the fraud issue
22 only, that we would very much like to have the opportunity to
23 investigate, do discovery, see what -- where that ends up.
24          And there's a lot of swirl, for sure, but you'd
25 expect that.  And I don't know what the explanations are.

```
 1  they're pointing --
 2           THE COURT:  -- clause that would exclude a fraudulent
 3  inducement.  But that, I think, is also an issue for another
 4  day.
 5           I think there is plenty of evidence that the
 6  defendant engaged in fraudulent activity in order to receive
 7  the $200,000 loan, and then the forbearance of it, of
 8  termination and the rights that the plaintiff had.
 9           The party seeking receivership has a valid claim to
10  the property that is subject to the proposed receivership.  Is
11  there any dispute about that?
12           MR. COHAN:  I'm sorry.  One more time.
13           THE COURT:  Well, the party seeking receivership has
14  a valid claim to the property that is subject to the proposed
15  receivership.  What is it you're seeking in the receivership?
16           MR. WINSBERG:  We're seeking to appoint a receiver
17  over the collaterals defined in the loan documents, Your Honor.
18           THE COURT:  That is all of their property?
19           MR. WINSBERG:  Correct, Your Honor.
20           THE COURT:  And including the accounts into which the
21  payments were to be made?
22           MR. WINSBERG:  Correct, Your Honor.  We have
23  Mr. Rierson's testimony plus the loan, the note, the guarantee,
24  the first forbearance -- the first forbearance, the second
25  forbearance agreements plus the UCCs all in front of
```

1              MR. COHAN:  When?  Tomorrow?

2              THE COURT:  Yeah, sure.

3              MR. COHAN:  Judge, can we do this next week?

4              THE COURT:  Well, I don't know.  I feel like I need
5    to do something, because I feel like -- I don't know how
6    imminent the payment is.  I think that's the issue here, is the
7    imminency of the injury.

8              MR. COHAN:  And by the way, there is a live dispute
9    about personal jurisdiction and venue here.

10             THE COURT:  Okay.  Well, we can talk about that, and
11   we ought to do that, because I care a lot about the
12   jurisdiction.  I don't want to overstep jurisdiction, but I
13   think your client came to somebody in Georgia for a loan.

14             MR. WINSBERG:  It's not just that, Your Honor.  The
15   forbearance agreements both -- he acknowledges and wavies -- he
16   acknowledges and consents to the jurisdiction and venue in this
17   Court.

18             THE COURT:  Okay.  We'll get to that on another day,
19   if that arises.  I think there is enough that I am not pumping
20   the brakes on that myself, and nothing else has been put to me.

21             I think they have shown me enough to get a receiver.
22   I don't think there's going to be a remedy available to them.
23   If what is due under these three contracts has dissipated, and
24   everything your client has said to me -- not said to me --
25   everything that I have seen of your client in this case so far

1  tells me that he has committed fraud and is unlikely to use the
2  money he has coming in to pay the people that he owes it.
3           MR. COHAN:  Judge.
4           THE COURT:  Let me finish.  The thing that concerns
5  me, I think there is an imminent injury, I think there's not
6  likely to be a remedy to them.  I think the greater good is on
7  their side, in the other elements that I've talked about.
8           But the strongest argument you make is that if I do
9  this, it will ruin the business.  I don't know if that's true
10 or not.  I don't see any evidence on you from that, and I don't
11 see how it could be.  We have a gentleman who could become the
12 receiver and all he then does is collect the money and then
13 your clients can explain where the money is supposed to go.
14          But this gentleman and his company have a pretty
15 strong claim that any money that comes in on those three
16 agreements ought to go to them.
17          MR. COHAN:  There is a super easy lesser remedy.
18          THE COURT:  Perfect.  Then you tell me what it is.
19          MR. COHAN:  Order an injunction, enjoin the
20 defendants from disbursing any money received into any of the
21 corporate accounts after today without an order from the --
22          THE COURT:  What do you say about that?
23          MR. WINSBERG:  It doesn't work, Your Honor, because
24 our collateral package, and the lender's collateral package is
25 broader than those three agreements.

```
 1              THE COURT:  Because it has all of the other assets?
 2              MR. WINSBERG:  That's correct, Your Honor.
 3              THE COURT:  Why don't we do this.  I think the way
 4   your client has done this, particularly the idea that false
 5   people are talking to people on phones and things like that, I
 6   think we need to go to the entities that owe the money.  I
 7   think you-all ought to agree to an injunction for now, that
 8   allows me to enjoin them from paying anybody other than
 9   whatever account you-all agree to.
10              MR. COHAN:  Right.
11              THE COURT:  Does that give you at least 60 percent of
12   what you're looking for?
13              MR. WINSBERG:  It's helpful, Your Honor, but it does
14   not deal with the issue.  We don't know what other collateral
15   is out there, whether assets are there, and whether those are
16   being dissipated, as we speak and once --
17              THE COURT:  Well, and I don't know that either.  And
18   so when I look at the element that has to do with the
19   collateral, or whether there's likely to be a diminishing in
20   value, I look at primarily those three accounts.  Those three
21   accounts are what your client lent on.  They are, I suspect,
22   your client's primary hope of getting repaid.  And I will give
23   you the discovery you need to go and do the other things you
24   want to do.
25              MR. WINSBERG:  Yeah, we would want as part of that,
```

1   you know, immediate turnover of the books and records.  And we
2   would also want, Your Honor, you know, an injunction enjoining
3   him until there's a receiver in place for making decisions from
4   making material transfers out of the businesses.
5           MR. COHAN:  And I'm fine with you enjoining the three
6   companies from disbursing to anybody other than a designated
7   account.
8           THE COURT:  Okay.  I would like you-all to prepare
9   for me an injunction tonight or tomorrow -- I think there is
10  all kinds of bases for an injunction here.  I think they've got
11  a high likelihood of success.  I think there's a real chance of
12  irreparable injury.  I think the fact that the public interest
13  weighs in favor of this, and I think that the gravity of the
14  damage weighs in favor of it as well.
15          It also can be a stopgap measure that is short of me
16  doing a receiver.  And I'm not putting that outside of the
17  realm.  I'm simply saying when I look at the imminent injury,
18  yes, I guess there's other collateral that you have, I know you
19  do, you have essentially everything, but there might be a
20  number of other companies that do, too, including the bank, so
21  I'm a little hesitant to overreach into that right now when
22  what you've shown, I think, is the imminency of the assets that
23  really you have a priority on.
24          MR. WINSBERG:  Which is why we really wanted the
25  receiver, Your Honor.

1              THE COURT:  I know, to go in and figure it out.
2              MR. WINSBERG:  To figure it all out and to have --
3              THE COURT:  But they tell me that appointing a
4    receiver is going to ruin their company because it's going to
5    get out and it's going to ruin their reputation.
6              MR. WINSBERG:  I mean, there's no evidence of that,
7    Your Honor.
8              THE COURT:  I know.  I know.
9              MR. WINSBERG:  And every borrower says that.  Every
10   borrower that comes into a Court resisting a receiver says the
11   business is finished if you do this, but there's no evidence of
12   that.  And you have to weigh that with the public -- the public
13   has an interest in making sure that they're not engaging in
14   fraudulent conduct and fraudulently ripping off other lenders.
15             You know, there are other means out here.  So we
16   really strongly believe that the management needs to be
17   displaced now.  It's not just with respect to our clients, it's
18   with respect to Ms. Godfrey's client, who's in the courtroom,
19   and the other lenders that believe maybe they had a priority.
20             So the injunction is helpful, but they're -- you
21   know, we still have real concerns that they're going to operate
22   in a way that we really need a receiver to sort this out.
23             And we were envisioning -- because we had thought
24   about this issue, because I know it's a difficult decision for
25   Your Honor, was get a receiver in place, get -- have the

1  receiver come back to the Court and do a report and have a

2  further hearing after the receiver figures out what's going on

3  here and --

4             THE COURT: I'm going to do that kind of. But I do

5  think I have to look at less severe equitable remedies.

6             You want to say something?

7             MS. GODFREY: Yes, your Honor, thank you. I just

8  want to clarify, it's not clear that the accounts that we're

9  talking about are, in fact, the plaintiff's, you know, sole,

10 primary collateral. And I believe my client would have a

11 priority right to those funds, based upon the lien.

12            THE COURT: Oh, of course you would. Yes, because

13 you didn't subrogate over them into that.

14            MS. GODFREY: Correct.

15            THE COURT: Okay. I get it.

16            MS. GODFREY: Correct, Your Honor. Thank you.

17            THE COURT: I get that. Thank you. I would like

18 you-all to prepare an order that enjoins the three entities --

19            MR. COHAN: Your Honor, may I sit?

20            THE COURT: Yes. Of course. I'm sorry.

21            That enjoins the three entities that are the subjects

22 of the three contracts from paying the proceeds on those

23 contracts to anyone other than -- who do you want them paid to?

24            MR. WINSBERG: We need an independent third party

25 paid to, because Ms. Godfrey's right, there's going to be a

```
 1  dispute as to who's entitled to them.
 2          THE COURT:  Okay.  You-all work it out.
 3          MR. WINSBERG:  I would suggest having them paid
 4  directed to Mr. Glade, as the potential --
 5          THE COURT:  That seems reasonable to me.
 6          MR. COHAN:  As long as the plaintiff is paying for
 7  that, I'm fine with that.
 8          THE COURT:  Okay?
 9          MR. WINSBERG:  Yeah, I mean, what if we -- our
10  co-counsel is raising the issue, what if one of those three
11  parties claims -- because they're not in front of Your Honor --
12  what if they -- what if they claim they're not really bound by
13  the injunction.
14          THE COURT:  Well, I'm going to expand it, but I doubt
15  they'll do that.  We'll see.  Maybe they will.  But I'm also
16  going to enjoin the defendant and Mr. Smith from doing anything
17  with those funds and require them, if they receive any funds,
18  they must immediately notify and transfer to Mr. Glazer, is the
19  that the name?
20          MR. GLADE:  Glade.
21          THE COURT:  Glade.  Sorry.  That money to Mr. Glade.
22          Everybody understand that?
23          MR. WINSBERG:  Yes, Your Honor.
24          THE COURT:  Third, I'm going to require the defendant
25  to provide to the plaintiff whatever financial records they
```

```
 1  think they need in order to look at the other assets and
 2  whether there is diminishing or a threat of diminishing in
 3  value those items to which you have a claim.  Okay?
 4           MR. COHAN:  Understood.
 5           THE COURT:  You-all need to figure out the wording of
 6  that.  I have the right to order that discovery right now, but
 7  I'm going to do it as part of this order.
 8           MR. WINSBERG:  Your Honor, in the event that
 9  there's -- inevitably, in these types of cases, disputes as
10  to --
11           THE COURT:  You can call me tomorrow at any moment.
12  We're going to get this order out tomorrow.
13           MR. WINSBERG:  Thank you, Your Honor.
14           THE COURT:  I'm not going to let the sun set one more
15  night without putting some protection in place for what I think
16  was supposed to be a pretty easy transaction.  Somebody took $2
17  million, and there's money out there to pay it back.  So I'll
18  be available any time tomorrow.  I will get you-all on the
19  phone and we will hammer out those details.
20           But I would like to get from you-all the guts of the
21  agreement with whatever you want in there, as early as you can
22  tomorrow.  If you have disagreement, redline it, and then we'll
23  all get together and we'll figure out how to do it.  Okay?
24           MR. WINSBERG:  Thank you, Your Honor.
25           MR. COHAN:  Thank you, Your Honor.
```

1  THE COURT: If there is anything else that you think
2  we need to put in there, let me know.
3  But what I think this does for your client is it
4  gives a more precise type of receivership than just letting
5  somebody come in from Atlanta and essentially take over the
6  company.
7  I think this company is doing creative things with TV
8  shows, and I think because of that, they need to stay operating
9  their company. And this also might be the first baby step. It
10  may be that you're back here in a little bit and you say,
11  Judge, the discovery has shown that there's all this
12  dissipation and now we have to go to a receiver. Okay. I'll
13  do that.
14  MR. WINSBERG: All right. Thank you. Yeah, we would
15  want, as part of that, like in the injunction a negative
16  pledge.
17  THE COURT: Say again.
18  MR. WINSBERG: We'd like as part of the injunction a
19  negative pledge where they can't pledge their collateral to any
20  new lenders.
21  THE COURT: That seems reasonable.
22  MR. COHAN: Those three companies?
23  MR. WINSBERG: Yes. And then we'd also like to have
24  the ability -- you know, like with the documentation, have the
25  ability to have Mr. Smith sit for a deposition.

```
 1              THE COURT:  I think that's reasonable.
 2              MR. WINSBERG:  And maybe have the Court continue the
 3   hearing, you know, depending on what we find.
 4              THE COURT:  That's fine.  I think you've got a lot.
 5   The only concern I have is whether there is a less extreme
 6   equitable remedy, like an injunction, and secondly, whether
 7   what I would be doing is putting the company out of business.
 8              But that's something that if we come back here about,
 9   because you tell me that it's all these other things, I'm going
10   to require the defendant to come here and testify and explain
11   that to me.
12              But I can't just ignore that, especially when we're
13   on fairly short notice.  Okay?
14              MR. WINSBERG:  Thank you, Your Honor.
15              THE COURT:  Anything else you want in there?
16              Do you want to take a minute and talk to your client?
17              MR. WINSBERG:  Just one second, Your Honor.
18              THE COURT:  Yes.  Take a minute and talk to your
19   client.  See if they have any ideas.
20              MR. COHAN:  May I approach the court reporter just to
21   get a rough copy?
22              THE COURT:  Sure.
23                    (Pause in proceedings)
24              MR. WINSBERG:  Thank you, Your Honor.  One additional
25   clarification is the injunction, in dealing with the pledge of
```

```
 1  the assets and -- it's the collateral, you know, and so to the
 2  extent that that collateral has been moved around outside of
 3  those -- of the borrower entities and the guarantor, if there's
 4  affiliates, like, for example, Hoplite Studios is an affiliate
 5  of the borrowers and made a loan that we allegedly got a
 6  subordination agreement on, the injunction should apply to
 7  their -- to their affiliates.
 8              THE COURT:  I agree.  I agree.  I agree with you.
 9  And otherwise, you'll be able to do the discovery to see if
10  there is something else.
11              And I really do mean this, Mr. Winsberg, this is open
12  to adjustment.  If you think that something else needs to be
13  done to give your client the protection that they want, there's
14  no reason we can't adjust it to dial it in better until we get
15  to wherever -- if you decide to come back and you think you
16  need a receiver, like I said, I'm not putting that outside the
17  realm of possible.
18              I think you have a really good claim for it, but I
19  think there's just maybe a couple of steps that we can go.
20  That if I say at the end, I tried to do these other things and
21  it didn't work, then I know I have to do a receiver.  That's
22  really the one thing I have.
23              So if you decide next week that there's something
24  that when you're looking at it or when your clients are looking
25  into something, and they think we think it should be this, let
```

1  me know.  It doesn't take me but a minute to modify the terms
2  of an injunction.  Okay?  Does that make sense?
3          MR. WINSBERG:  Yes, Your Honor.
4          THE COURT:  Does everybody agree with that?
5          MR. COHAN:  Thank you, Your Honor.
6          THE COURT:  Do you think there's a question about
7  whether or not the other entities will abide the injunction?
8          MR. WINSBERG:  I'm just not sure, Your Honor.  I
9  just -- I would hope that any entity would honor an injunction
10 entered by a federal district court judge, and we wouldn't have
11 a problem.
12          But you don't know.  And the concern here is based
13 upon the fraud, even with the injunction, we are dealing, as
14 the Court has found, with somebody who is untethered to the law
15 at this point.  So we are concerned about compliance and we
16 know there's remedies for that, and -- but we are concerned
17 about they will be operating -- the same person who committed
18 the fraud is going to be operating in the interim, even with
19 the injunction.  That is -- that is a concern.
20         THE COURT:  Well, let's see where we get.  And you
21 can always go get discovery from those third parties and figure
22 out what is happening and what is going to happen.
23         MR. COHAN:  Did you want to say something,
24 Ms. Godfrey?
25         MS. GODFREY:  Yes.  I just want to be clear on what

1  procedures that will follow.  The entry of the Court's
2  injunction, Mr. Blade's holding the funds.  Is the Court
3  anticipating that we come up, like, with a briefing schedules
4  for disbursement or --
5              THE COURT:  Yes.  Well, I think that you ought to
6  say, if you can, in the injunction what happens, right?  I
7  think if we can agree what will happen to the funds, or we can
8  have a hearing on it, you can put that in the injunction, that
9  when there are funds that are collected by Mr. Glade, that the
10 parties will notify the Court and we can decide what to do.
11 And the most important thing is to make sure that nothing
12 happens to it.
13             MR. WINSBERG:  Your Honor, one other thing that came
14 to my attention with the clients, and I do believe it would be
15 helpful here to help us is that the Court to order the defense
16 to let Mr. Glade -- give him access to the premises on
17 reasonable notice to look and inspect the books and records in
18 person, in light of what has gone on here.
19             THE COURT:  Okay.
20             MR. WINSBERG:  Thank you, Your Honor.
21             THE COURT:  Okay.  All right.  Thank you-all.
22
23        (Whereupon, the proceedings were adjourned at 5:07
24 p.m.)
25